## APPEAL OF ISAAC JEANES, SURVIVING, ETC.

| 116 | 573 |
| 127 | 616 |

| 116 | 573 |
| 172 | 625 |

FROM THE COURT OF COMMON PLEAS NO. 3 OF PHILADEL-
PHIA COUNTY.

| 116 | 573 |
| 24 SC | 128 |

Argued January 20, 1887—Decided October 3, 1887.

Shares of stock were pledged to secure payment of loans from a discounting firm on notes reciting the pledge and authorizing the holder on non-payment at maturity to sell the shares without demand of payment or further notice. Afterwards it was discovered that some of the shares pledged had been fraudulently overissued by officers of the company and, under a decree of court, the company substituted genuine shares to the pledgees therefor. After maturity of the note and without notice to the pledgor, the shares, which (including those substituted) on dissolution of the firm had been divided between the partners, were sold by the individual owners, some at public others at private sale. After several years, the stock having reached a high value but his notes remaining unpaid, the pledgor filed a bill against the pledgees to recover the difference between the value of the shares and the sum due on the loans: *Held*,

1. That the holders had the right upon the dishonor of the notes to sell the pledge at public or private sale, without notice to redeem and without notice of the sale.

2. That the substitution of the genuine shares for the fraudulent ones pledged, was not such a change of the subject matter of the pledge as to affect its identity or the power of sale; and that said sale by the several owners divested the pledgor's interest in the pledge as of the date of such sale.

3. *Damnatum:* The court below reversed the report of the master dismissing the plaintiff's bill, and decreed payment of a very large sum by the defendants, filing, however, no opinion disclosing the grounds of such decree, although in five other like cases by the same plaintiff reports dismissing the bill were confirmed: *Held*, contrary to an orderly course of procedure in such case.

Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.; CLARK, J., absent.

No. 6 January Term 1887, Sup. Ct.; court below, No. 260 September Term 1883, C. P., in equity.

On September 17, 1873, William T. Elbert filed a bill in equity in the court below against Isaac Jeanes, surviving Wm.

J. Morris, trading as Isaac Jeanes & Co., and the West Philadelphia Passenger Railway Company.

The plaintiff averred that on July 25, 1877, being the owner of one hundred shares of stock in the West Philadelphia Passenger Railway Company, he pledged the same to Isaac Jeanes & Co., as collateral security for the payment of his note of that date, at two months, for $12,000; that on August 21, 1877, said firm discounted two other notes of that date, one for $22,000 and another for $23,000, for which he pledged four hundred like shares; and on September 6, 14 and 17, 1877, three other like notes, for $12,000, $33,600 and $31,500, respectively, for which he pledged six hundred and sixty shares; that the said firm surrendered to the said railway company the certificates of stock delivered to them by him, and procured to be issued to them, in their own firm name, certificates for a like number of shares, in lieu thereof; that by reason of financial straits and difficulties the plaintiff had been unable to pay the said notes and to redeem the collateral, and the said firm had continued to hold both the notes and the collateral; that since said shares had been pledged by him, the stock of said company had sold as high as $160 per share and dividends had been declared to the amount of nineteen dollars on each share, and that crediting the said firm with the amount of the notes and interest and charging the value of the stock at $160 per share and the dividends received, there would be a balance due the plaintiff of $26,624.80, which the said firm refused either to pay or to account for to the plaintiff. The bill prayed for an account, payment of the balance found to be due, a surrender of the plaintiff's notes and an injunction to restrain the defendant and the railway company from transferring or permitting a transfer of said stock pledged.

To this bill Isaac Jeanes answered, admitting the discounting of the notes and the pledging of the eleven hundred and sixty shares as collateral, but averring that, though the firm still held the notes discounted, yet as they had not been paid, the said shares had been sold for the highest market price that could be obtained therefor, the sales having been made by the authority contained in each of the six several notes, which were of one form, appearing hereafter in the opinion.

The answer further denied the receipt of any dividends on said shares, and set out the times when and the prices at which the shares had been sold, showing that the sum realized thereon was $100,132.74, and submitting that as the amount of the notes and interest, admitted to be unpaid by the bill, was $181,015.20, the plaintiff was still indebted to the respondent firm in the sum of $80,881.59, less interest on the amounts received for the shares from the time when received, "upon the payment of which or even a much smaller amount, said notes will be surrendered to the complainant."

The answer of the railway company defendant, admitted no knowledge and but little information as to the facts averred in the bill, but charged that so far as the company had belief, based on knowledge or information, the plaintiff was not at any time the owner of the shares claimed by him; that said shares, with thousands of others, had been fraudulently issued by John S. Morton, at the time the company's president, and were not genuine shares; that plaintiff had conspired with said Morton to obtain value for said shares by pledging them; that at the time of the pledging the plaintiff was utterly insolvent and without financial credit; and further, that as moneys had been obtained from the pledgees of said shares solely upon the faith of the shares thus issued as genuine, the company by a decree in certain equity proceedings had been compelled to deliver to said Isaac Jeanes & Co., and others, like pledgees, who had proved that they had advanced their moneys *bona fide* upon the belief that the shares were genuine, as falsely asserted by the company's officers and agents upon the face of the certificates, shares of stock of like amount with those which had been fraudulently issued, which decree had been fully satisfied; and further that, inasmuch as the plaintiff had not been a *bona fide* holder of said shares, but the coadjutor of Morton in the fraud charged, he had no right to recover moneys remaining in the hands of the co-defendant firm, but the same were payable to the railway company; to obtain a decree for payment of which the said company, after answering, filed a cross-bill.

To this cross-bill of the railway company, Elbert answered that at the times he received and pledged the said shares he did not know and had no ground to suspect they were fraudu-

lent, and he had given Morton value for all of them; that he was not a party to the proceedings in equity referred to, was not called as a witness therein, and was not bound by the decree; that his pledgees received from him no authority to surrender the shares pledged and to accept other shares in lieu thereof; that he was not insolvent and without credit and had advanced money and otherwise gave credit to Morton on the faith of the shares received from Morton, and Morton was still indebted to him in an amount largely in excess of the surplus of the value of the shares pledged over the debt which they were to secure, and denied the right of the railway company to receive that surplus.

The cause was referred to *Mr. Abraham M. Beitler*, as examiner and master, before whom the facts following were established:

During the summer of 1877, Elbert, the plaintiff, borrowed from Isaac Jeanes & Co., at different dates and on different notes, of the form described in the firm's answer to the bill, sums aggregating $134,100, and pledged as collateral security, eleven hundred and sixty shares of the capital stock of said railway company, which shares were regularly transferred to said firm upon the books of the said company. On or about September 22, 1877, whilst said notes were maturing, it was discovered that there had been a large fraudulent overissue of the stock of that company, made by John S. Morton, its president, in collusion with others of its officers; and it was charged that, as regards the shares pledged by the plaintiff to said firm, six hundred and sixty thereof were genuine and five hundred fraudulent. That these shares were fraudulent was not known to the plaintiff nor to the firm at the time they were pledged.

To No. 807 September term 1877, in the Court of Common Pleas No. 2, Swain et al. v. West Phil. P. R. Co., proceedings in equity were instituted to determine the status of the over-issued stock. In this suit, to which said firm was a party, but Elbert was not, it was established that Elbert had pledged to different creditors 3437 shares of said stock, of which 1161 were genuine, and 2276 were of the fraudulent overissue. These shares pledged by Elbert included the 660 genuine

shares and the 500 overissued shares pledged to Isaac Jeanes & Co. There had been issued of the shares of the railway company 17,207, of which 8000 were genuine and 9207 were overissued. The master in that suit found that the value of the capital stock of the company was $1,280,000, viz.: 8000 shares at $160, and that the holders of the overissued shares were entitled to a money compensation to be measured by dividing the value of the whole capital by the whole number of shares, genuine and overissued, that is $\frac{1,280,000}{17,207}$, say $75 per share. Before, however, the master reported, the company perfected an increase of its capital stock, inducing the holders of 7000 of the overissued shares, including Isaac Jeanes & Co. to agree thereto, and that the capital stock should consist of 15,000 valid shares, to cover 8000 of the original genuine issue and 7000 of the overissue, the loans made upon the remaining 2207 overissued shares to be paid off by the company out of its earnings. This arrangement was carried out, and the firm of Isaac Jeanes & Co., without notice to Elbert, surrendered the shares pledged by him to them, and accepted new certificates for 1160 shares upon the basis of an issue of 15,000 shares, retaining, however, all the notes of Elbert.

The firm of Isaac Jeanes & Co., at the date of the loans and pledges, consisted of Isaac Jeanes, Walter B. Morris, Daniel G. Evans and the estate of Wm. J. Morris, who had died in March, 1887. After the discovery of the overissue and the subsequent substitution, Elbert endeavored to obtain his notes from the firm, and was willing on receipt of them to consider the business with the firm settled. On October 1, 1877, the firm was dissolved, and the 1160 shares divided among the partners at $50 per share: Isaac Jeanes receiving 666 shares, the estate of Wm. J. Morris 376 shares, Walter B. Morris 61 shares and Daniel G. Evans 57 shares. These shares so divided were subsequently sold by the several owners at different times from August 27, 1880, to June 26, 1881, the entire amount received therefor being $100,132.74. Elbert was informed of the sales by Isaac Jeanes soon after they were made.

Upon the foregoing facts, the master found as conclusions of law that the shares of stock which the pledgees held after the decree in the equity proceedings in the Court of Common

Pleas No. 2 referred to was entered, were the same in effect which they had accepted from Elbert, and that they held them under the terms of the power of sale given in the notes, and were not required to give notice to Elbert either of the validating of the stock by the decree of the court nor of the subsequent sale of the shares; and further, that the sales made of the substituted with the other shares by the several partners were made under a lawful exercise of the power given to the holders of the notes. The master therefore recommended that the plaintiff's bill as well as the cross-bill by the railway company be dismissed, and that the costs in the original action wherein Elbert was plaintiff be paid by him, the costs in the cross action by the railway company, and the master's fee, three fourths by Elbert and one fourth by the railway company.

To the master's report the railway company excepted in so far as they were required to pay any part of the costs. A number of exceptions were filed by Elbert, the plaintiff, certain of which were that the master erred :

16. In finding that the power of sale in the collateral notes authorized the division of the pledge among the members of pledgee's firm.

18. In finding that the power of sale without notice extended to the several members of the pledgees' firm, as to the portions of the pledge severally allotted to them.

19. In reporting a decree dismissing the bill.

20. In not reporting a decree for plaintiff.

All the exceptions having been overruled in the supplemental report of the master, after argument on their renewal, the court *in banc* without opinion filed made the following decree :

Plaintiff Elbert's 16th, 18th, 19th and 20th exceptions sustained. All the other exceptions (except plaintiff Elbert's 8th, as to which the master corrects the statement complained of in his supplemental report) are dismissed, and the cause is referred back to the master to state an account, on the basis of charging defendants with the highest market price of the stock, since the division of the pledge among the members of pledgees' firm, and all dividends declared thereon up to the date of such highest market price, with interest, and crediting defendants with amounts originally loaned, with interest, and to report form of decree.

The master then heard testimony, and stated an account charging the defendants with the value of the 1160 shares of stock on February 10, 1886, at $206.50 per share, being the highest market price the stock attained, with the various dividends thereon, and interest on said dividends, and crediting plaintiff's notes due defendants with interest to said date, showing a balance due plaintiff on said date $95,969.80, which with interest to July 24, 1886, the date of the decree, was $98,317.08; whereupon, after overruling exceptions to the account stated, the court made the following decree:

This cause came on to be heard at this term, and was argued by counsel; and thereupon, upon consideration thereof, and of the master's report, upon reference back to him to state an account, the exceptions to which are hereby dismissed, it is now, July 24, 1886, ordered, adjudged and decreed as follows, viz.: That the plaintiff is entitled to recover from the defendant, Isaac Jeanes, the sum of ninety-eight thousand three hundred and seventeen $\frac{08}{100}$ dollars, and that the said defendant, Isaac Jeanes, pay to the plaintiff, William T. Elbert, the said sum of ninety-eight thousand three hundred and seventeen $\frac{08}{100}$ dollars, together with all costs of the cause except as hereinafter provided; and further, that the said defendant, Isaac Jeanes, surrender to the said plaintiff, William T. Elbert, his six promissory notes in his bill mentioned. And it is further ordered that the cross-bill of The West Philadelphia Passenger Railway Company be dismissed, and that the plaintiff therein, the said company, pay the costs in the matter of the cross-bill. The master's fee to be paid, one-fourth by the said The West Philadelphia Passenger Railway Company as directed by the master, and three-fourths by defendant, Isaac Jeanes.

Thereupon this appeal was taken by Isaac Jeanes, who specified that the court, *inter alia*, erred:

2. In not decreeing a dismissal of the bill for want of merit.

3. In not dismissing the bill by reason of the matter being not one cognizable by a court of equity.

4. In decreeing payment of any sum by defendants.

5. In decreeing that the sale of the shares of West Philadelphia Passenger Railway Company stocks by defendants was illegal.

6. In decreeing that complainant was entitled to the highest value attained by said stock prior to the decree.

*Mr. John G. Johnson,* for the appellant:

1. The bill discloses no case within the jurisdiction of a court of equity. It seeks to charge the pledgees with the market value of the pledged shares remaining in their hands, though it avers no payment or tender of payment of the debt for which the shares were pledged. And, as the exact amount of the debt, the exact value of the shares and the precise amount of the dividends declared, were all known to the plaintiff, it is not possible under the evidence in this case so to amend the bill as to present a cause within the jurisdiction of a court of equity. There are no circumstances which entitle the plaintiff to equitable relief: Conyngham's App., 57 Penn. St. 479; Foll's App., 91 Idem 437.

2. Even if entitled to recover, the case discloses no reason for giving a higher measure of damages than the value of the stock at the time the conversion became known to Elbert. Assumpsit would not lie, because there was never any performance of the contract on the part of the pledgor. After conversion, trover would lie, however, without tender, because the court would permit a deduction of the indebtedness from the damages, and the measure of the damages would be the value of the pledge at the time of conversion: Neiler v. Kelley, 69 Penn. St. 403: Work v. Bennett, 70 Idem 489. Courts administering equitable jurisdiction would refuse to give to this complainant, suing at common law, a measure of damages higher than that which would bring him in debt to the defendant to the extent of $60,000; and it cannot be supposed that the same courts would give him, suing in equity, such a measure of damages as would cancel that indebtedness, and award him upwards of $98,000. Rights are not dependent upon the form of action: Baker v. Drake, 53 N. Y. 220; Huntingdon & Broad Top R. Co. v. English, 86 Penn. St. 247; North v. Phillips, 89 Penn. St. 254.

3. Elbert's laches and conduct estopped him from claiming the damages awarded to him. He knew of the sales at or near the time they were made. It was his duty to repudiate them, but he did the opposite: Means v. Milliken, 33 Penn. St. 517; Hayward v. Bank, 96 U. S. 611; Colket v. Ellis, 10 Phila. 379; Rennyson v. Rozell, 106 Penn. St. 407; Baker v. Drake, 53 N. Y. 216.

4. Finally, the sale of the shares was properly made in pursuance of the power contained in the notes. The division among the partners did not divest the title of Elbert and did not destroy the power of sale. The power of sale remained with the partners in whose possession the notes continued. The notes were indorsed by Elbert in blank and entitled the "holder" to sell the collaterals in case of default: Bryant v. Baldwin, 52 N. Y. 232; Jones, Pledges § 605.*

*Mr. F. Carroll Brewster* and *Mr. Henry S. Cattell* (with them *Mr. F. H. Cheyney* and *Mr. J. Cooke Longstreth*), for the appellee:

1. The right of defendant's firm under the extraordinary powers contained in the plaintiff's original notes was simply to *sell* the stock pledged upon the non-payment of the notes at maturity, at public or private sale, without notice, and hold the maker liable for any deficiency. The defendant's firm made no sale, but took the pledge as its own; and without the assent of the pledgor exchanged it for something else which was divided among the different members of the firm. At common law, the pledgee cannot alienate the pledge: Story Bailm., §§ 318, 346. The right of the pledgee is strictly confined to a sale, and he cannot appropriate to himself on default of the pledgor: Story Bailm., § 318; Mack. C. L., 277; French Civil Code, § 2078; Laughton v. White, L. R. 6 Eq. 165; Girard F. & M. Co. v. Marr, 46 Penn. St. 504.

2. The defendant's firm having had no authority to make the exchange, had no authority to divide amongst its members and afterwards sell the stock received in exchange; and therefore the equity of redemption of the plaintiff in the pledge has never been divested by any act of the defendant or of his firm. The defendant's firm had but one remedy as regards the pledged shares, and that was to legally sell them: Conyngham's App., 57 Penn. St. 474.

G

OPINION, MR. JUSTICE GREEN:

It is much to be regretted that no opinion was filed by the learned court below with a statement of their reasons for

---

* The able arguments of counsel on both sides covered a much wider range than the questions above considered, upon which the cause was decided.

reversing the report of the master, upon the vital, fundamental question in this case. A decree for almost a hundred thousand dollars has been entered against a citizen without a solitary reason for the rendition of such a decree appearing upon the record, while very substantial reasons appear there, in the master's report, showing why no decree should be made against him for any amount. The magnitude of the judgment alone was sufficient to impel any court to justify its action by a most careful and well-considered opinion. In addition to that, the orderly course of procedure in this class of cases, especially where a master's report is reversed, requires that an opinion of the court be filed explaining the reasoning and principles upon which its conclusions were founded, so that we might be fully informed upon that subject. We have several times called attention to this matter and in a few instances have refused to hear causes brought up on appeals from *pro forma* decrees without opinions, although they were confirmations of the master's reports. In this particular case the situation is especially anomalous because there are five other appeals from the same court, from decrees made upon the reports of the same master, upon substantially the same facts, and in all of them the final and controlling question being the very same as in this; and yet, while the master's report dismissed the plaintiff's bill in all six of the cases, the court's decree sustains the report in five of the cases and reverses it in one. In the five cases, as in this, there is no opinion of the court and we thus have the unpleasant spectacle of conflicting decrees made by the same court upon the same question and without any reason assigned for any of them. If we were in doubt about the determination of these causes we would refer them back in order that opinions might be filed giving us some information as to the occasion of the seeming conflict of decision which we have indicated. But we have no doubt as to how they ought to be decided, and will therefore dispose of them finally.

In the view that we take of the present case there is but one question which requires consideration and that is, whether the pledgees of the stock had the lawful right to sell it at private sale and without notice to the pledgor? In an ordi-

Opinion of the Court.

nary case of pledge of course there is no such right. The pledgee must first give notice to redeem and if the pledge is not redeemed and he proposes to sell it, he must sell it at public sale and after notice to the pledgor. If this be not done the pledgor's rights are unaffected by the sale. But this is not an ordinary case of pledge. It is affected by a special contract. The pledgees made loans of money to the pledgor upon pledges of certain passenger railroad stock, and the notes given by the pledgor for the loans expressed the terms of the contract of pledge as well as of the loan. They were all alike and in the following words:

PHILADELPHIA,                    1887.

Two months after date I promise to pay to the order of myself $          without defalcation, for value received, having deposited herewith                    shares of West Philadelphia Passenger Railway Company stock which I authorize the holder of this note, upon the non-performance of this promise at maturity, to sell either at the Broker's Board or at public or private sale without demanding payment of this note or the debt due thereon and without further notice, and apply the proceeds, or as much thereof as may be necessary, to the payment of this note and all necessary expenses and charges, holding me responsible for any deficiency.

WILLIAM T. ELBERT.

It is not for one moment pretended that there is anything illegal about this contract, and therefore it needs no discussion except an exposition of its terms, an application of them to the subsequent facts which are quite undisputed so far as they are material, and a brief consideration of the rights and duties of the parties respectively. The extreme plainness and simplicity of the language of the instrument, make it manifest at once, that the pledgee of the stock delivered with the note, had the undoubted right, immediately upon the dishonor of the note, to sell it, at either public or private sale, without notice to redeem and without notice of the sale. The subsequent facts were, that all the notes were dishonored, amounting to over a hundred thousand dollars, for which eleven hundred and sixty shares of stock had been pledged. This oc-

curred in August and September 1877. The plaintiff Elbert, who was the pledgor, failed to pay a single dollar of his indebtedness to the defendants, who were the pledgees and who with a good faith which has not been questioned for an instant, advanced the whole of this very large sum of money upon the credit of the collaterals. Shortly after the last loan was made it was discovered, and the fact became public, that some of the officers of the company whose stock had been pledged, had made large over-issues of stock fraudulently and without right, and it was developed on the hearing of this case that 500 of these pledged shares were of this spurious and illegal issue. The market price of the stock at once depreciated very greatly, so that the aggregate of the stock pledged was entirely insufficient to repay the pledgees for the amount of their loans; and, as Elbert was a hopeless insolvent, from whom not a dollar could be or ever was collected, the defendants were left with a large quantity of comparatively worthless collateral on their hands, and were obliged to confront, as they did, an enormous loss upon their transactions with the plaintiff. They did not however exercise their right to sell the collateral but held it for several years. In the meantime, upon proper proceedings against the corporation whose stock had been fraudulently issued, it was held to be responsible for the acts of its officers; and, as a consequence, five hundred new and legitimate shares were issued to the defendants in place of the same number of spurious shares which the plaintiff had pledged to them. The defendants surrendered the spurious shares which they had received from the plaintiff, and accepted in their place the same number of genuine shares from the company. They thus held 1160 genuine shares, instead of 660 genuine and 500 false which they had received from the plaintiff. In adopting this course they very greatly benefited the condition of the plaintiff as events later on fully proved. In 1880 the stock of the Railway Co. rose in value after a long period of depression. The defendant's firm had become dissolved in October 1877 by the death of William J. Morris, one of its members, and the immense debt due them by Elbert was carried by the liquidating partners, who also carried the collateral until the closing up of

the business of the firm in 1880. When this was done the stock was alloted among the different partners in proportion to their interests in the firm. Subsequently from August 1880 to May 1881 the various members of the firm sold, at private sale, their several allotments of the stock, and while they realized the full market price of the stock at the time of sale it was altogether insufficient to pay off the debt due them, and a very heavy loss resulted to them upon closing out the transaction. These sales were made without notice to Elbert and without any special notice to redeem. They were known by Elbert at least as early as April, 1882; but the master finds that in his opinion the statement of Mr. Jeanes that he informed Elbert of the sales immediately after they were made, was true. It is a matter of very little moment except as it affects the question of the plaintiff's good faith in bringing this action. In the letter he wrote to Mr. Jeanes in April, 1882, he stated that he assumed the matter as settled in full and advised them accordingly.

The question then recurs had the defendants the legal right to sell the shares without notice and thereby divest Elbert's interest in them? It is difficult to understand how there can be any question upon this subject, since the right to sell without notice is expressly given by the contract of pledge. A very slight reference to the authorities shows that the right is well recognized and constantly enforced. Thus it is said in Jones on Pledges § 611: "A waiver of the requirement of notice of the pledgee's intention to sell, and the time and place of sale, may be made by agreement of parties. A waiver of the common law rule of notice is generally made when the parties agree upon a special power of sale, for under such a power it is usual either to waive notice of sale altogether or else to provide for a special notice. Such notice is waived by giving the pledgee the option to sell at private sale. Under authority given a pledgee to sell at public or private sale at his option he may sell without notice in the usual manner of selling such property in the market."

Loomis v. Starr, 72 Ill. 623: Where a party deposited certain township bonds as collateral security for the repayment of certain sums of money borrowed, it was held that the lender

with whom they were deposited had the right to sell the same in default of payment without any personal notice to the pledgor of an intention to do so, it being so stipulated in the agreement. Other authorities to the same effect are Robinson v. Hurley, 11 Iowa 410; Milliken v. Dehon, 27 N. Y. 364; Hamilton v. State Bank, 22 Iowa 306.

It is argued for the plaintiff that as the spurious shares were delivered to the railway company by the defendants and genuine shares were delivered to the defendants in their place, the identity of the pledge was destroyed and the shares sold were not the same as the shares pledged and were therefore not covered by the power of sale. It is a most ungracious argument, but as it is altogether untenable it cannot prevail. The shares pledged were 1160 shares of the West Philadelphia Passenger Railway Company, and the shares sold were also 1160 shares of the same company. Their identity was therefore absolute as to their number and as to the particular corporate stock of which they were a part. But 500 of those pledged were false, fraudulent and spurious shares which neither Morton, from whom Elbert received them, nor Elbert, who made no advances upon them, could ever have asserted against the company which was defrauded by their issue. Only the fact that the defendants had loaned money upon them gave them a right to have genuine shares issued in their place and that fact enures to the benefit of the plaintiff by no merit of his. When he pledged the original 1160 shares for value which he received, he thereby gave an implied warranty that they were actual, legal, genuine shares of this particular company, and it was *that kind* of shares that he empowered the defendants to sell. All the parties bargained upon the faith of the shares being genuine, and the plaintiff, above all others, is bound by that quality of the shares. But he was guilty of a breach of this warranty, whether innocently or not is quite immaterial. Legally he was bound to make those shares good. It has been done for him, by the act and the merit of the defendants, and they held after they received the genuine shares exactly what he agreed to give them and no more. As a matter of course as between him and them he never would be permitted to allege his own want of title to the property which he had delivered to them upon ample consideration paid by them to him. *A fortiori* he

cannot be heard to aver their want of title to the identical thing he assumed to deliver them, because they had simply assented to a change in the certificates necessary to perfect the plaintiff's title as well as their own. He is estopped from making any such averment. It would be a monstrous wrong to permit such an iniquity to be perpetrated. To say of this plaintiff that he was denied the rights of an innocent stockholder because he could not prevent the company from issuing the genuine stock in place of the false, is to ignore, first, the fact that he never was an innocent stockholder, and secondly that the issue of the new stock was done by the decree of a court to which his assent was in no manner essential. Even if the company had voluntarily increased their capital stock while the defendants held the pledge, that circumstance could not possibly affect the determination of such a question as this, although it might be true that the aliquot proportion which the genuine shares originally pledged bore to the total capital stock, was greater before than after the new issue. It has nothing to do with this question.

It is also argued that the sale of the stock pledged was not the single act of the firm in its collective capacity, and was therefore not an execution of the power. In point of fact the sales were all made by individual members of the firm, but as all assented and none of them are here complaining, so far as the plaintiff is concerned the sales must be regarded as the act of all. The defendants were not bound to sell all the shares at one time or through any particular member of the firm, and the details of the sales are not of his concern unless some right of his was violated. The defendants, by their long holding of the shares through the time of their great depression, conferred a most signal benefit upon the plaintiff by obtaining a much higher price for them than was possible at an earlier date. Had the price then receded this proceeding would never have been heard of. It happened to advance far beyond the wildest calculations. Of this advance the plaintiff now seeks to take advantage at the ruinous cost of the defendants, although he never tendered a dollar of his indebtedness or made the slightest attempt or offer to redeem the pledge. If by the law he were entitled to this advantage, of course he would obtain it no matter how great the hardships; but as it is, neither the

rules of law nor the principles of equity can give him the decree he seeks, and he must therefore be content without.

The decree of the court below is reversed, and the plaintiff's bill is dismissed; and it is ordered that the costs be paid as recommended by the master, to wit, the costs in the original action and of this appeal be paid by the plaintiff, Elbert, and the costs in the cross-action, by the West Philadelphia Passenger Railway Company; the master's fee to be paid three fourths by Elbert, and one fourth by the railway company.