In re STARKS.

No. 22033.

District Court, E. D. Pennsylvania.

April 28, 1944.

Bertram K. Wolfe and Buckman & Buckman, all of Philadelphia, Pa., for claimant.

Harry A. Rutenberg and Henry Arronson, both of Philadelphia, Pa., for trustee.

KALODNER, District Judge.

This matter comes before this court on a referee's certificate of review, the question being the correctness of the referee's order of February 4, 1944, confirming and reinstating the referee's opinion and order of December 2, 1943, as amended by the referee's opinion and order of December 9, 1943.

It appears that on January 2, 1942, the Northwestern National Bank entered into a contract [1] with the bankrupt, Joseph A. Starks, jeweler, trading as Starks and Com-

---

[1] The contract is as follows:

"This Agreement made this 2nd day of January, 1942 by and between the Northwestern National Bank in Philadelphia, a corporation organized and existing under the laws of the Congress of the United States (hereinafter called 'Bank'), party of the first part, and Joseph A. Starks, trading as Starks and Company, of the City of Philadelphia (hereinafter called 'Debtor'), party of the second part;

"Witnesseth:

"Whereas Debtor is engaged in the retail jewelry business at 142 S. 17th Street, Philadelphia, Pennsylvania, and

"Whereas Debtor is indebted to various persons, firms and corporations, including the Bank, and

"Whereas Debtor has assigned, transferred and set over unto the Bank, as collateral security, all his right, title and interest in and to his equity in certain merchandise pledged with pawnbrokers, which merchandise is more particularly identified and set forth in a schedule of said pledges hereto attached, made part hereof and marked Schedule 'A', and

"Whereas the Debtor, Bank and certain other creditors of Debtor have entered into a written agreement, bearing even date herewith, by the terms of which Debtor and said other creditors have agreed to settle their claims at the rate of 50% provided such settlement is made by the Debtor within six months of the effective date of said agreement, and

Bank has agreed that no moneys derived from Debtor's business, excepting from the sale of said pledged merchandise, shall be paid to Bank prior to the settlement of said creditors' claims as provided in said agreement,

"Now, Therefore, in consideration of the premises and of the mutual agreements by and between the parties hereto, the parties hereto do hereby agree as follows:

"1. Bank agrees to redeem said pledged merchandise, more particularly identified and set forth in said Schedule 'A', by paying the amount of the loans thereagainst to the various pledgees with whom the merchandise is now pledged and the amounts so paid shall be added to the claim of the Bank against the Debtor and the possession of said merchandise shall remain with the Bank as collateral security.

"2. During the term of the pledge agreement, Bank agrees that the Debtor may withdraw from the pledge any specific item of merchandise for the purpose of sale upon the payment by the Debtor to the Bank of the proceeds of said sale, provided however, that any such sale shall be for an amount at least equal to the amount at which the specific item is valued and which value is set opposite each item upon the schedule of pledged merchandise hereto attached, made part hereof and marked Schedule 'A'.

"3. Debtor agrees that he will use his

pany, Philadelphia. On April 27, 1942 Starks disappeared, taking with him, according to the referee's finding, $27,259.40 of jewelry which had been entrusted to him for sale by the Bank, admittedly as its agent.

On May 7, 1942, a creditors' petition was filed, and on July 9, 1942, an adjudication of bankruptcy was entered against Starks.

The controversy here was precipitated by the fact that the Bank originally filed a proof of claim in the amount of $62,884.07 as a general claim for money loaned or advanced to the bankrupt, the amount claimed including the aforementioned $27,259.40. The trustee and certain creditors objected to inclusion of the $27,259.40 on the ground that the Bank had entrusted the jewelry in question to the bankrupt as its own agent. In apparent recognition of the validity of that objection, the Bank seeks to file an "amended" proof of claim setting forth separately its claim of $27,259.40 premised on a conversion by the bankrupt. This is objected to on the ground that the amended claim asserts a new cause of action and as such is barred by Section 57, sub. n of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. n.

▮▮▮ First, as to the contention that credit must be given for the value of the jewelry entrusted to the bankrupt by the Bank:

There is no doubt that the Bank, having turned over to the bankrupt the $27,259.40 of jewelry, must give credit in that amount on its indebtedness claim against the bankrupt estate. It is clear that where a bank holds a pledge as collateral to the bank's note which it delivers to the bankrupt to sell and apply the proceeds on the note thereby makes the bankrupt its agent, and where he sells the pledge for sufficient to pay the note but retains the proceeds, the note is extinguished as relates to other creditors and cannot be proof against the estate of the bankrupt. In re Hurley, D.C. Minn.1926, 18 F.2d 363. The rule is stated

---

best efforts to bring about the sale of said pledged merchandise for the Bank, from time to time and as soon as the same may be done without sacrifice, and Debtor agrees to cooperate in this connection with the Bank for the purpose of realizing as much as possible therefor. Bank agrees to cooperate with Debtor to bring about said sales and in this connection agrees to deliver to Debtor, as its agent, from time to time, such items of merchandise for which there are prospective sales.

"4. Bank and Debtor agree that Debtor shall pay the amount of his indebtedness to the Bank, together with interest at the rate of 3%, as follows:

"(a) By the application of the proceeds of the sale of said pledged merchandise, as the same may be received from time to time,

"(b) By the additional payment of $500.00 per month, the first payment to be made seven months from the date of this agreement,

"(c) By the payment of any balance which may still be due on account of said claim at the expiration of two years and six months from the date of this agreement.

"5. During the term of this agreement, the Bank agrees that it will not institute any action at law or equity for collection of its claims or any insolvency or bankruptcy proceeding in any Court of any State or of the United States, provided however, that should the Debtor suffer or permit any mortgage, incumbrance or other lien to be placed upon his assets, or make any conveyance or transfer of his assets, or any part thereof, out of the ordinary course of his business, or should there be instituted any proceedings for the voluntary or involuntary liquidation, reorganization or consolidation of the assets of the Debtor, or an assignment for the benefit of creditors, receivership or bankruptcy, by or against the Debtor, or should there be a default under the terms and conditions of said agreement between Debtor, Bank and certain other creditors, bearing even date herewith, then and in such case, the whole of the claim of the Bank against the Debtor shall immediately become due and payable and the Bank may proceed to enforce collection as provided by law.

"6. The parties hereto agree to be legally bound by this agreement and that this agreement shall be binding upon their several and respective legal representatives and assigns.

"In Witness Whereof the parties hereto have executed this agreement the day and year first above written."

Attached to the agreement there was a list, labeled "Schedule A", of the items subject to the terms of the contract, each item having a number, a description and an "amount", that is, the "stated value" below which Starks was not to sell the item.

as follows in 8 Corpus Juris Secundum, Bankruptcy, Section 421 on page 1277:

"If the creditor has permitted the bankrupt to sell collateral securities as his agent to apply the proceeds on the debt *the former must credit the proceeds received* on the amount of the debt in extinguishment thereof, *although the bankrupt has failed to account for the proceeds as required.*" (Emphasis supplied.)

That brings us to the objection of the trustee and the creditors that the amended proof of claim constitutes a new cause of action and thus is barred by Section 57, sub. n of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. n, since it was admittedly filed after expiration of the statutory period. This objection should be sustained.

The original claim was based on the indebtedness of the bankrupt to the Bank, while the amended claim is based on Starks' failure to account to the Bank for the jewelry entrusted to him for sale.

Clearly the amended claim sets up a new cause of action. It is true that the Bank, and perhaps the other creditors, as well as the trustees in bankruptcy, knew of the existence of this cause of action, but at no time prior to the date of the petition to amend does it appear that the Bank asserted or gave intention of asserting this claim. The words of Judge Buffington, in the case of In re Thompson, 3 Cir., 1915, 227 F. 981, 983, are particularly in point:

"In some form the substance of a claim must have been made within the proper time, but if this has been done amendments may be made afterward. Whether formal or informal, a claim must show (as the word itself implies) that a demand is made against the estate, and must show the creditor's intention to hold the estate liable. And this is especially the duty of a secured creditor * * *."

The Bank points to many cases stating that much liberality has been shown in permitting amendments after the statutory period has expired. However, the limitations on this notion are so widely accepted it is unnecessary to list the cases. An excellent statement in this respect is found in the case of In re G. L. Miller & Co., 2 Cir., 1930, 45 F.2d 115, 116:

"It is urged by appellant that the trend of modern decisions is to allow great liberality in the amendment of claims in bankruptcy. So it is; but it is to be noted that the authorities cited as indicating this liberal tendency deal with situations which fall short of that here presented. They permit amendments to correct defects of form, or to supply greater particularity in the allegations of fact from which the claim arises, or to make a formal proof of claim based upon facts which, within the statutory period, had already been brought to the notice of the trustee by some informal writing or some pleading in the bankruptcy proceedings. See Globe Indemnity Co. v. Keeble, [4 Cir.], 20 F.2d 84; In re Fant, D.C.W.D.S.C., 21 F.2d 182; In re Atlantic Gulf & Pac. S. S. Corp., D.C. Md., 26 F.2d 751; In re Kardos, 2 Cir., 17 F.2d 706, 708; In re Kessler, 2 Cir., 184 F. 51; Scottsville Nat. Bank v. Gilmer, 4 Cir., 37 F.2d 227. It is quite another matter to use an 'amendment' as a device for filing after the statutory period a claim based upon a cause of action of which no notice whatever had been given the trustee by anything previously filed. The distinction has been recognized by high authority. In Hutchinson v. Otis, 190 U.S. 552, 555, 23 S.Ct. 778, 47 L.Ed. 1179. * * * If the limitation imposed by section 57 n, as amended * * * is to be given any reasonable meaning, we think it must be true that the right to amend can go no further than to permit the bringing forward and making effective of that which in some shape was asserted in the original claim. * * *"

To the same effect are Tarbell v. Crex Carpet Co., 8 Cir., 1937, 90 F.2d 683; Matter of Keck, D.C., 23 F.Supp. 121; Id., 3 Cir., 1938, 98 F.2d 589; Matter of Skidmore, D.C.N.D.Ala., 1939, 29 F.Supp. 293; cf. In re Rothert, 7 Cir., 1932, 61 F.2d 1; Ebeling v. Bobeng, 7 Cir., 1941, 123 F.2d 520; In re Lipman, 2 Cir., 1933, 65 F.2d 366; In re Fiegel, D.C.S.D.N.Y., 1937, 22 F.Supp. 364.

As to the two lesser issues involved: the objecting creditors claim additional credit in the amount of $1,660, which represents the difference between the sale price and the "stated value" of the items sold by the Bank, and in the amount of $2,679.14 which represents the difference between the sale price and the "stated value" of items sold by the pawnbrokers.

The substance of these claims is that the agreement between the Bank and Starks, together with Schedule "A", amount to an agreement within the terms of Section 57 sub. h of the Bankruptcy Act, 11 U.S.C.A. § 93, sub. h, and hence the Bank

could not sell the items in its possession for less than the amount listed and that the Bank, under the terms of the agreement, was obligated to redeem all the jewelry from the pawnbrokers, and having failed to do so, it should be required to give credit for the difference between the sale price and the "stated value" in the agreement.

 On the issue of the items sold by the Bank, I am of the opinion that the bankruptcy rule applies and the Bank need give credit only for the amount it actually received. The objecting creditors' argument that the contract and the schedule operate to come within Section 57, sub. h of the Bankruptcy Act, is without merit. However, I do not consider it necessary to assume the burden of discovering the intentions of the parties in respect to this matter when, by the very terms of the contract itself, the Bank's conduct was permitted. Paragraph 5 of the contract reads:

"5. * * * should the Debtor suffer or permit any mortgage, incumbrance or other lien to be placed upon his assets, or make any conveyance or transfer of his assets, or any part thereof, out of the ordinary course of his business, or should there be instituted any proceedings for the voluntary or involuntary liquidation, reorganization or consolidation of the assets of the Debtor, or an assignment for the benefit of creditors, receivership or bankruptcy, by or against the Debtor, or should there be a default under the terms and conditions of said agreement between Debtor, Bank and certain other creditors, bearing even date herewith, *then and in such case, the whole of the claim of the Bank against the Debtor shall immediately become due and payable and the Bank may proceed to enforce collection as provided by law."* (Emphasis supplied.)

By its own terms, the agreement for sale through Starks came to an end, at the Bank's option, on July 9, 1942, and possibly earlier. The sales by the Bank to which the creditors object were made on July 30, 1942, and October 15, 1942. In this case, the Bank sought to enforce collection under the law of pledges. The sales were made in accordance with the security agreement between Starks and the Bank wherein Starks waived notice and gave the Bank authority to sell at public or private sale. Such agreements are valid in Pennsylvania. Jeanes' Appeal, 1887, 116 Pa. 573, 11 A. 862, 2 Am.St.Rep. 624; Englert v. First National Bank at Pittsburgh, 1939, 333 Pa. 297, 5 A.2d 136; Read v. Pennsylvania Co., 1940, 338 Pa. 389, 12 A.2d 925; Jones v. Costlow, 1944, 349 Pa. 136, 36 A.2d 460; and cf. Hiscock v. Varick Bank, 1907, 206 U.S. 28, 27 S.Ct. 681, 51 L.Ed. 945. While a sale of this sort might be set aside where a fair price was not obtained, it has not been shown here that the prices obtained by the Bank were not the fair market value of the items at the time of the sales. It should be noted here that the agreement between the creditors, the Bank, and Starks whereby the creditors agreed to stand by for six months, also came to an end by its own terms before the sale.

 As to the controversy with respect to the items sold by the pawnbrokers, I am of the opinion that the Bank is not to be required to give credit for the difference between the sale price and the "stated values" in Schedule "A". The objecting creditors base their argument on the ground that the contract executed in January 2, 1942, obligated the Bank to redeem all items pawned by Starks. Considering the agreement as a whole and the conduct of the parties while the agreement was in operation, it seems to me that the agreement contemplated the redemption first of those items in which there was an equity and for which there was a prospective sale. It was an agreement whereby both parties were co-operating to reduce Starks' obligations to the Bank. The custom, during the four months the agreement was in effect, was for the Bank to redeem an item when and if Starks thought he could sell it. The Bank can hardly be said to be obligated to increase Starks' debt to it after the failure of Starks, amounting to a breach of contract, to carry out the terms of the agreement.

An order may be submitted in accordance with this opinion.