# HISCOCK v. VARICK BANK OF NEW-YORK.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

**No. 244.   Argued March 15, 1907.—Decided May 13, 1907.**

Individual policies on the life of a partner held as collateral security for his individual indebtedness can be sold by the creditor and applied to the payment of such individual debt although the debtor was also liable for partnership debts; and if the policies are fairly sold by the creditor he can prove for the balance of the individual debt and the whole of the partnership debt.

The extent and validity of a pledge are local questions and the decisions of the state court are binding on this court.

Under the law of New York a pledgor may waive strict performance of the common law duties of the pledgee and if so waived a sale may be held without notice, demand or advertisement.

The bankruptcy act does not deprive a lienor of any remedy with which he is vested by the state law.

134 Fed. Rep. 101, affirmed.

GENERAL order in bankruptcy, No. XXXVI, relates to "Appeals," and subdivision 3 thereof provides: "In every case in which either party is entitled by the act to take an appeal to the Supreme Court of the United States, the court from which the appeal lies shall, at or before the time of entering its judgment or decree, make and file a finding of the facts, and its conclusions of law thereon, stated separately; and the record transmitted to the Supreme Court of the United States on such an appeal shall consist only of the pleadings, the judgment or decree, the finding of facts, and the conclusions of law."

The Circuit Court of Appeals, in pursuance thereof, made and filed its finding of the facts and its conclusions of law thereon.

August 18, 1903, a petition in bankruptcy was filed against the firm of Jacob M. Mertens & Company and the individual members thereof. They were adjudicated bankrupts Septem-

ber 15, and on the following fourteenth of October plaintiff in error was elected trustee in bankruptcy of both the co-partnership and the individual estates. At the time the petition was filed the firm was indebted to the Varick Bank to the amount of $27,893.85, evidenced by notes made or endorsed or guaranteed by Mertens & Company, five of which aggregating $22,500, four for $5,000 each, and one for $2,500, were collateral notes. These notes were alike in form and contained the following provision:

"On the non-performance of this promise or upon the non-payment of any of the liabilities above mentioned, or upon the failure of the undersigned forthwith, with or without notice, to furnish satisfactory additional securities in case of decline as aforesaid,—then, and in either such case, this note shall forthwith become due and payable, without demand or notice and full power and authority are hereby given to said holder to sell, assign and deliver the whole of the said securities, or any part thereof, or any substitutes therefor, or any additions thereto, or any other securities or property given unto or left in the possession of the holder by the undersigned, for safe keeping or otherwise, at any Broker's Board or at public or private sale, at the option of the said holder, without either demand, advertisement or notice of any kind, which are hereby expressly waived. At any such sale the said holder may purchase the whole or any part of the property sold, free from any right of redemption on the part of the undersigned, which is hereby waived and released. In case of sale for any cause, after deducting all costs or expenses of every kind for collection, sale or delivery, the said holder may apply the residue of the proceeds of the sale or sales so made, to pay one or more or all of the said liabilities to it or him as to it or him shall seem proper, whether then due or not due, making proper rebate for interest on liabilities not then due, and returning the overplus, if any, to the undersigned, who agree to be and remain liable to the said holder for any deficiency arising upon such sale or sales. The undersigned do hereby

authorize and empower the said Bank (but no other holder) at its option, at any time, to appropriate and apply to the payment and extinguishment of any obligations or liabilities of the undersigned to it, whether now existing or hereafter contracted any and all moneys now or hereafter in the hands of the said Bank, on deposit or otherwise, to the credit of or belonging to the undersigned, whether the said obligations or liabilities are then due or not due."

Endorsed upon the back of each of these notes and signed by J. M. Mertens & Co. and J. M. Mertens appeared the following:

"In consideration of one dollar paid to the undersigned, and of the making, at the request of the undersigned, of the loan evidenced by the within note, the undersigned hereby jointly and severally guarantee to the Varick Bank of New York, N. Y., its successors, endorsers or assigns, the punctual payment, at maturity, of the said loan, and hereby assent to all the terms and conditions of the said note and consent that the securities for the said loan may be exchanged or surrendered from time to time, or the time of payment of the said loan extended without notice to or further assent from the undersigned, who will remain bound upon this guarantee, notwithstanding such changes, surrender or extension."

On the day the petition was filed, Mertens individually was indebted to the bank in the sum of $25,489.62. This indebtedness was upon his guaranty of the five collateral notes, of one of which he was also the maker, the balance being based upon his endorsement of sundry notes of third parties amounting to about $3,000. Mertens individually, to secure the payment of the indebtedness to the bank, pledged to it two policies of insurance upon his life, one for $50,000, No. 417,171, and the other for $10,000, No. 252,314. The $50,000 policy was a free Tontine policy, issued February 15, 1889, payable to Mertens or his estate, the yearly premium was $1,750, and the Tontine dividend period expired Feb-

ruary 15, 1909. The $10,000 policy was issued December 21, 1882, payable to Jennie Mertens, wife of the insured, but in the event of her prior death, to the children of the insured, and the annual premium was $272.50. It was a Tontine savings policy and the Tontine period was completed December 21, 1902, at which time Mertens, as the insured, withdrew in cash the share of the surplus apportioned to the policy, and continued it in force on the ordinary plan. On March 16, 1901, Jennie Mertens and the children of Jacob and Jennie executed an assignment of the $10,000 policy to the bank. On March 25, 1901, J. M. Mertens joined with his wife in executing a further assignment of the same policy to the bank. March 21, 1901, Mertens individually executed an assignment of the $50,000 policy to the bank. These assignments contained no power of sale. In addition the policies were pledged to the bank under the terms of the collateral notes and agreements of pledge. It appeared from the proofs that the claim against Mertens individually was secured by an individual deposit of Mertens of the sum of $6,000 as collateral, in addition to the policies.

Obligations aggregating $1,691.93, endorsed by Mertens, had matured and remained unpaid on August 18, and on September 15, obligations aggregating $13,570.47 had matured and remained unpaid, and in the latter amount were included two of the collateral notes for $5,000 each and some $3,000 of the notes of third persons, endorsed by Mertens individually.

On or before September 14, 1903, the two policies were delivered to a duly licensed auctioneer by the attorneys of the bank with instructions to sell the same at public auction at the New York Real Estate Office salesrooms, to the highest bidder, and they were offered for sale and sold to the highest bidder, an agent of the bank, on September 14, the $50,000 policy for the sum of $7,000 and the $10,000 policy for the sum of $3,250. No notice of the sale was given to any one except the bank. In due time the bank filed with the referee

in bankruptcy two proofs of claim, one against the co-partnership estate aggregating $27,893.85, and another against Mertens for the sum of $9,118.37. Thereafter the claims were amended. Objections to both were filed by the trustee, alleging in substance that the sales of the policies were illegal; that the value of the securities held by the bank had not been ascertained according to the provisions of the bankruptcy act, and that the trustee still owned the equity.

No other evidence than appearing above was offered by the trustee on the hearing before the referee under the objections. The referee held, in substance, that the sale of the policies was null and void, and that the value of the securities had not been ascertained according to the provisions of section 57$h$ of the bankruptcy act, and refused to allow either claim against the estate or estates. Counsel for the trustee moved for the referee to direct a method by which the security held by the bank should be liquidated and that in so doing he direct the bank to resell the policies on notice to the trustee. The motion was objected to, but was granted by the referee. The bank petitioned for a review, and the District Court of the United States for the Northern District of New York on such review approved the referee's rulings. 134 Fed. Rep. 101. From the order of the District Court the bank appealed to the United States Circuit Court of Appeals for the Second Circuit. That court, as previously stated, filed its finding of the facts and its conclusions of law, which conclusions of law were as follows;

"1. That the order made by the referee and by the District Court was a rejection of the claims of the Varick Bank.

"2. That the policies in question did not belong to the partnership estate, and that the claim against the partnership should have been allowed in full.

"3. That the sale of the policies under the facts as stipulated was a good and valid sale and passed a good and valid title to said policies to the Varick Bank.

"4. That the value of said policies was properly liquidated

by said sale under the terms of section 57h of the Bankruptcy Act and that under said section the referee had no power to make the order directing a resale thereof.

"5. That said Bankruptcy Act did not suspend or enjoin the exercise of said power of sale during the time between the filing of the petition and the adjudication in bankruptcy.

"6. That the claim against the individual estate of Jacob M. Mertens should be allowed in full.

"7. That the burden of proving that said sale was unfair was upon the trustee."

The order of the District Court was reversed and the case remanded with instructions to proceed conformably with the opinion of the Circuit Court of Appeals. 144 Fed. Rep. 818. The case was then brought to this court on appeal.

*Mr. Will B. Crowley*, with whom *Mr. Ceylon H. Lewis* was on the brief, for appellant:

Between the time of filing the petition and the adjudication, the bankruptcy proceedings themselves were an injunction against any sale of the policies in question. After filing the petition, no sale could be held without leave of the court. *Whitney* v. *Wenman*, 198 U. S. 539; *Bryan* v. *Bernheimer*, 181 U. S. 188; *Mueller* v. *Nugent*, 184 U. S. 1. See also *Lee* v. *Franklin Sav. Inst.*, Fed. Cases, 8188; *Conner* v. *Long*, 104 U. S. 244; *McHenry* v. *La Société Française*, 95 U. S. 60; *Wiswall* v. *Sampson*, 14 How. 66; *State Bank* v. *Cox*, 143 Fed. Rep. 93; *In re Reynolds*, 127 Fed. Rep. 762; *In re Brooks*, 91 Fed. Rep. 509; *In re Antigo*, 123 Fed. Rep. 254; *In re Gutman*, 114 Fed. Rep. 1010; *In re Krinski*, 112 Fed. Rep. 975.

The pretended sale of the insurance policies held as collateral was a sham and was invalid at common law. It constituted no liquidation nor evidence of the value of the policies, which, it appeared, were worth more.

A pledgee cannot become the purchaser of pledged securities except by the express permission of the pledgor; a pledgee

is a trustee for the benefit of the pledgor. *Pauly* v. *State Loan Co.*, 165 U. S. 620. See also: *Easton* v. *German American Bank*, 127 U. S. 537; Perry on Trusts, 4th ed., sec. 602, *o. x.; Laclede Bank* v. *Richardson*, 156 Missouri, 275; *Dana* v. *Buckeye Co.*, 38 Ill. App. 371; Jones on Pledges, sec. 648; Story on Bailments, secs. 318–345.

The $6,000 deposit and the value of the policies should also be applied in reduction of the amount of the partnership claim. The express terms of the promissory notes so require. It did not appear that the policies belonged to J. M. Mertens.

In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor, the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid.

If the bank waived the terms of the notes and relied upon its legal rights to offset this deposit, then the time when the set-off was required to be made was at the time of the filing of the petition. Collier on Bankruptcy, 4th ed., 496; *In re City Bank*, Fed. Cases, 2742; *Drake* v. *Rollo*, Fed. Cases, 4066.

No liquidation of securities which is binding upon the bankruptcy court, can be made by a creditor except as directed by the court. The "value" of the securities was not determined and the referee had the right under § 57d to refuse to be bound by the alleged sale. *Whitney* v. *Wenman*, 198 U. S. 539; *McHenry* v. *Société Française*, 95 U. S. 60.

Whether the court must direct the manner of liquidation or not, sec. 57h provides that before having a claim allowed a secured creditor must deduct "the value of securities" held by him.

The referee had some discretion; he had a conscience to satisfy; he was required to ascertain the value and deduct it, and sec. 57d, which provides that the consideration of claims may "be continued for cause by the court upon its own motion," was ample authority for him to require further evidence of the value of the policies before allowing the claims.

This court has recently held that this power can be exercised. *Whitney* v. *Dresser*, 200 U. S. 536.

Mr. *Frederick M. Czaki*, with whom Mr. *Louis Marshall* was on the brief, for appellee:

The bank was not a secured creditor within the meaning of the term "secured creditor" as defined by the bankrupt act.

That "secured creditor" has a limited meaning in bankruptcy must always be remembered. In effect, no creditor is secured in bankruptcy unless there is a lien held by him, or accruing to his benefit, upon the property of the bankrupt.

The copartnership estate is entirely distinct from that of the individual. The assets must be separately administered, and can in no way be so commingled as to deprive a creditor holding security upon the individual estate of a partner from proving the full amount of his debt against the copartnership estate, irrespective as to whether he has or not filed a claim against the individual estate. *In re Noyes Bros.*, 127 Fed. Rep. 286; *Gorman* v. *Wright*, 136 Fed. Rep. 164; *Swarts* v. *Fourth Natl. Bank of St. Louis*, 117 Fed. Rep. 1; *In re Swift*, 106 Fed. Rep. 65; *In re Heyman*, 95 Fed. Rep. 800; *In re Bingham*, 94 Fed. Rep. 796; *In re Headley*, 97 Fed. Rep. 765–771; *In re Coe, Powers Co.*, 1 Am. Br. Rep. 275; Collier on Bankruptcy, 3d ed., 321; *Madison Sp. Bank* v. *Pierce*, 137 N. Y. 444.

The filing of the verified proof of debt established the appellee's *prima facie* case, and entitled it, in the absence of proof under the objections, to the allowance of the claim. Sec. 57, Sub. Div. G, Act of 1898; *Whitney* v. *Dresser*, 200 U. S. 532.

The appellant's failure to offer any evidence of the facts and circumstances attending the sale, or the value of the policies, affords a presumption that such evidence, if adduced, would operate to the prejudice of his contentions that the sale was fraudulent, and the prices paid inadequate.

The appellant was content to rest his case upon the mutual

concessions made, and therefore his failure to call the wit-
nesses concerned in the transaction raises the presumption,
that had he done so, their testimony would have negatived
the slightest inference of fraud or bad faith. *Kirby .v. Tall-
madge,* 160 U. S. 379; *Runkle* v. *Burnham,* 153 U. S. 216–225;
*Graves* v. *The United States,* 150 U. S. 118, 120; *Clifton* v.
*The United States,* 4 How. 242, 244; *Choctaw & M. R. Co.* v.
*Newton,* 140 Fed. Rep. 225–238; *Gulf, C. & S. F. Ry. Co.* v.
*Ellis,* 54 Fed. Rep. 481, 483.

The contract of pledge expressly granted to the appellant
an absolute power of sale, coupled with an interest, which
would have survived the death, and did survive the insol-
vency of the pledgor. *Dixon* v. *Ewart,* 3 Merivale's Rep. 322;
*Corder* v. *Morgan,* 18 Vesey, 344; *Knapp* v. *Alvord,* 10 Paige
Ch. Rep. (N. Y.) 205; *Houghtaling* v. *Marvin,* 7 Barb. (N. Y.)
412; *Hutchins* v. *Hebbard,* 34 N. Y. 24, 27; *Weber* v. *Bridg-
man,* 113 N. Y. 600.

MR. CHIEF JUSTICE FULLER, after making the foregoing
statement, delivered the opinion of the court.

The errors assigned question the conclusions of law.

We need spend no time on the objection that the referee's
order did not amount to the rejection of the claims. What
the referee said was: "As the proof now stands, I shall,
therefore, decline to allow either claim as established against
the estate or estates."

The District Judge recited the action of the referee as
disallowing both claims, and entering "an order prescribing
the method for ascertaining the value of such policies," and
concluded: "The orders of the referee disallowing the claims
are approved and affirmed." 134 Fed. Rep. 102, 104. And
entered an order accordingly.

The Circuit Court of Appeals held "that the order appealed
from was, in substance and effect, a rejection of the claims,"
and said: "The bank insisted that its claims were for a definite

amount, the amount stated in its proofs of debt less the sum which it had already derived from the sale of the securities. The decision not only disallowed these claims, but left the bank remediless, unless it should consent to allow a different reduction."

We think it perfectly clear that the policies did not belong to the partnership estate. They insured the life of J. M. Mertens, and were payable, one to him or his legal representatives, and the other to his wife or children, or to him in the event of their death before his. And they had been assigned to the bank by him individually and the members of his family, as early as March, 1901, as collateral security, as well as by the collateral notes before mentioned. The fact that Mertens individually was the owner was in effect conceded, and the objections to the claims raised no issue in regard to it. That the partnership on some occasion may have pledged the policies in conjunction with Mertens' separate individual pledge had no special significance.

The notes provided that the holder might apply the proceeds of a sale to "pay one, or more, or all of the liabilities due it, as it shall deem proper, whether due or not." And it had the right according to the settled rule in equity and in courts of bankruptcy to apply the proceeds of the collateral in extinction of the individual debts. If the sale was a good and valid sale and the value of the policies was properly liquidated thereby, and applied on the individual indebtedness, it follows that the claim against the partnership should have been allowed in full.

And also the claim against the individual estate of Mertens for the balance, after deducting the $10,250 and the $6,000.

The contracts of pledge were made, executed and to be performed in the State of New York, and the rights of the parties were governed by the law of that State. No preference under the bankruptcy act was alleged or proved, nor was there any allegation or proof that the pledge of the securities was in fraud of the rights of the creditors or trustee. The

questions of the extent and validity of the pledge were local questions, and the decisions of the courts of New York are to be followed by this court. *York-Manufacturing Company* v. *Cassell*, 201 U. S. 344; *Thompson* v. *Fairbanks*, 196 U. S. 516, 522; *Humphrey* v. *Tatman*, 198 U. S. 91. Here there was an absolute power of sale coupled with an interest. The bank had had both title and possession of the policies for a period of more than two years before the filing of the petition. It had a valid debt against both the copartnership and individual estates, which is not questioned. It could, therefore, make a sale under the power granted, and transfer title in its own name. Numerous decisions of the Court of Appeals of the State of New York sustain contracts of pledge waiving the right of the pledgor to exact strict performance of the common law duties of a pledgee. In the absence of fraud, the pledgee may buy at his own sale held without notice, or demand, or advertisement, when power so to do is expressly granted by the pledgor. *Baker* v. *Drake*, 66 N. Y. 518; *Williams* v. *Trust Company*, 133 N. Y. 660; *Toplitz* v. *Bauer*, 161 N. Y. 325. And see *National Bank* v. *Baker*, 128 Illinois, 533; *McDowell* v. *Chicago Steel Works*, 124 Illinois, 491; *Farmers' National Bank* v. *Venner*, 78 N. E. Rep. 540.

It must be remembered that the Circuit Court of Appeals found that there was no fraud in fact in the sale. In respect of that Judge Wallace, delivering the opinion, said:

"The court below regarded the sale made by the bank as a fraudulent sale. There was no evidence of fraud, unless the facts which have been referred to justify the inference of fraud. We are at a loss to understand how fraudulent conduct can justly be imputed to a pledgee when it appears that whatever was done in executing the power of sale was done in full compliance with the terms of the pledge, and when there is no evidence that any unconscionable advantage was taken of the pledgor or his creditors. Doubtless the pledgee cannot avail himself of his authority, however unlimited, to sacrifice the property wantonly, or to purchase

it himself at a valuation so inadequate as to suggest a fraudulent purpose. If the valuation in this case was unfair, the burden was on the trustee to prove the fact."

The trustee did not offer to prove that others were prepared to purchase and might have done so but for want of information, or that the policies had a greater value than was realized at the sale, or that he was prepared to redeem the pledge for the benefit of the estate, nor did he offer to do so. There was nothing in the evidence tending to show a wanton sacrifice or an intention to buy in at so inadequate a price as to justify the inference of a fraudulent purpose.

Counsel for the trustee contends that the policies were worth more than was obtained at the sale, because the bank's agent, after having borrowed on the strength of the policies the exact amount of his bid immediately after the sale, subsequently borrowed thereon $2,622.75; and also that from the terms of the $50,000 policy it appeared that on the completion of the Tontine dividend period, February 15, 1909, the assured had the privilege to withdraw in cash $18,823, and in addition the surplus which might then be apportioned. And counsel called attention in' his brief filed herein, February 26, 1907, to the case of *Hiscock, Trustee,* v. *Mertens* then pending in this court as demonstrating that the $50,000 policy was worth more than was realized at the sale. But the $2,622.75 loan covered the next ensuing premiums on the policies with interest; and the $7,000 paid for the $50,000 policy with interest and the premiums of February, 1904, 1905, 1906, 1907 and 1908, with interest, and the last premium, would appear to have aggregated a total cost of $21,346.50; while if resort could be properly had to the record in another case to piece out the evidence in this the opinion in *Hiscock* v. *Mertens,* decided March 25, 205 U. S. 202, states that the evidence showed that this particular policy had a surrender value of $6,574. And as to the $10,000 policy no suggestion was made that the $3,250 was not a full price or even more, nor could there be in reason, for as Ray, J., said, *In re Mertens et al.,* 131 Fed.

Rep. 972, "it had become a simple life policy, payable to the wife of the assured, if living at his death; if not living, to his children, if any; and in default of child or children to the personal representatives of the assured. This policy concededly is so conditioned and incumbered, and the interest of the trustee therein, if any, is so remote and uncertain that it is of no practical value to the estate." Clearly there is nothing on the face of the record to justify a charge of fraud on account of inadequacy.

Section 57h provides: "The value of securities held by secured creditors shall be determined by converting the same into money according to the terms of the agreement pursuant to which such securities were delivered to such creditors or by such creditors and the trustee, by agreement, arbitration, compromise, or litigation, as the court may direct, and the amount of such value shall be credited upon such claims, and a dividend shall be paid only on the unpaid balance."

The court was by this subdivision empowered to direct a disposition of the pledge, or the ascertainment of its value, where the parties had failed to do so by their own agreement. It is only when the securities have not been disposed of by the creditor in accordance with his contract that the court may direct what shall be done in the premises. Of course where there is fraud or a proceeding contrary to the contract the interposition of the court might properly be invoked.

According to the terms of the bankrupt act, the title of the bankrupt is vested in the trustee by operation of law as of the date of the adjudication. Act of 1898, § 70, *a. e.* By the act of 1867, it was provided that as soon as an assignee was appointed and qualified the judge or register should, by instrument, assign or convey to him all of the property of the bankrupt, and such assignment shall relate back to the commencement of the proceedings in bankruptcy, and by operation of law shall vest the title to such estate, both real and personal, in the assignee." But § 70a of the act of 1898 omits the provision that the trustee's title "shall relate back to the com-

mencement of the proceedings in bankruptcy," and explicitly states that it shall vest "as of the date he was adjudicated a bankrupt." When the petition in the present case was filed the bank had a valid lien upon these policies for the payment of its debt. The contracts under which they were pledged were valid and enforceable under the laws of New York where the debt was incurred and the lien created. The bankruptcy act did not attempt by any of its provisions to deprive a lienor of any remedy which the law of the State vested him with; on the other hand, it provided, § 67*d:* "Liens given or accepted in good faith and not in contemplation of or in fraud upon this act, and for a present consideration, which have been recorded according to law, if record thereof was necessary in order to impart notice, shall not be affected by this act."

*Mueller* v. *Nugent*, 184 U. S. 1, is not to the contrary, as explained in *York Manufacturing Company* v. *Cassell*, 201 U. S. 344.

*Judgment affirmed.*