BUSH v. ADAMS.

(Circuit Court, S. D. New York. December 12, 1908.)

PLEDGES (§ 56*)—SALE OF PLEDGED PROPERTY—VALIDITY.

Where bonds pledged as collateral security were sold after default in payment of the debt secured, on notice to the pledgor and strictly in accordance with authority given by the contract, the fact that they were purchased by the pledgee, as was also expressly authorized, at less than their actual value, is not ground for impeaching the sale in equity, nor is the fact that pursuant to previous announcement the purchaser of the first lot sold was given the option to take all, where the sale was at public auction at an exchange, no objection was made to the manner of sale, and no facts are alleged showing fraud or unfairness.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 162; Dec. Dig. § 56.*]

In Equity. Demurrer to bill of complaint in suit to set aside a sale of collateral and to stay a common-law action brought to recover the difference between the amount of the proceeds of such sale and the amount due on certain promissory notes for which such collateral was held as security.

George S. Cooper, for complainant.
F. S. Bangs, for defendant.

RAY, District Judge. At New York, April 1, 1907, the Western Maryland Railroad Company, of which the complainant is now receiver, duly appointed, by its president, B. F. Bush, for value received, executed and delivered to Edward D. Adams 40 of its promissory notes, each reading as follows (aside from the number of the bonds pledged as collateral), viz:

"$75,000.                                        No. ———.

"New York, April 1, 1907.

"On April 1, 1908, fixed, for value received, the Western Maryland Railroad Company hereby promises to pay, to its own order, at the office of the Farmer's Loan and Trust Company in the city of New York, seventy-five thousand dollars with interest, payable on the first days of April, July, October and January, at the rate of six per cent per annum until paid, having deposited herewith, as collateral security for the payment of this note, $100,000 par value Western Maryland Railroad Company's first mortgage 4% bonds, of $1,000 each, bearing all coupons unmatured at this date, numbered from ——— to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

———— both inclusive, and does hereby give full authority to the holder hereof to sell the whole or any part thereof, at any broker's board, or at public or private sale, at the option of the holder hereof, on the non-performance of this promise, or in case of the insolvency, bankruptcy or failure of the undersigned, and without notice of intention to sell, or of the time or place of sale and without demand of payment of this note; and in case of any sale or other disposition of any of the securities aforesaid, after deducting all expenses of collection and sale, to apply the residue of the proceeds to pay this note. And in case of deficiency the undersigned agree to pay to the holder hereof the amount thereof forthwith after such sale with legal interest.

"It is also agreed and understood that upon any sale of any of said collaterals the holder hereof may become the purchaser of all or any part thereof, and hold the same thereafter in his, or its own right absolutely free from any claim of the undersigned        Western Maryland Railroad Company,

"[Seal]                                          By B. F. Bush, President.

        "Attest:    L. F. Timmerman, Secretary."

The bonds mentioned were duly put up as collateral. It is not alleged that there was any new modifying or qualifying agreement. The bill alleges that these notes were in renewal of a former set of notes, and that, as a part of the agreement for the renewal, it was agreed:

"That the Deutsche Bank should have the right to purchase any part of the $4,000,000, par value, of bonds securing said loan at any time before March 1. 1908, at the price of 80% of their par value: and that such bonds so purchased, and their coupons, should be stamped 'Payable in Berlin and Frankfort at the rate of marks 4.20 per dollar': that the railroad company should apply for listing of said bonds so purchased on the New York Stock Exchange, and that, if the Deutsche Bank should desire to apply for quotation of such bonds upon any of the stock exchanges of Europe, the railroad company should pay the expenses connected with such application."

In 1906 and 1907 the said railroad company committed itself to large expenditures for betterments, improvements, extensions, and equipment, but because of financial conditions in the money market it was unable to meet such expenditures by an issue and sale of bonds, and hence met them partly from temporary loans and partly from current revenues.

The defendant, Edward D. Adams, is the agent and representative of the Deutsche Bank, a foreign corporation, and in substance the complaint alleges that such bank was to furnish the money and renew the notes. From time to time in December, 1907, and January and February, 1908, representatives of the said railroad company had conferences with said Adams as to the notes and their approaching maturity, with a view to securing an extension thereof. Pending the negotiations, and on the 17th day of February, 1908, Adams wrote a letter to the board of directors of the railroad company stating, in substance, that the Deutsche Bank would not renew the notes, but would expect them to be paid at maturity. Thereupon, and on or about March 5, 1908, proceedings were taken by the trustee of mortgage given to secure the bonds for the appointment of a receiver of the said railroad company, and the complainant was duly appointed.

Adams was informed of the proceedings and of a proposed plan to pay the interest on such bonds maturing April 1, 1908. March 7, 1908, a general notice was published of the formation of a committee to prevent a default under the mortgage, and that such committee

would co-operate in all measures to preserve its integrity, including an application to the court for an order to pay the interest on said bonds maturing April 1, 1908. The bill alleges:

"That said Adams favored and urged the policy of such payment, and it was not until after assurance had been given to him that a petition to the court for an order authorizing the receiver to provide for and pay said interest was about to be presented that said Adams took and carried out the peremptory, hasty, insufficient, and inequitable proceedings and methods for the sale of said bonds hereinafter set forth."

Then comes the following allegations:

"(19) That on March 10, 1908, said Edward D. Adams addressed a communication to the defendant company stating that, in view of the insolvency of said company, he had concluded to sell the $4,000,000 first mortgage bonds deposited as collateral security, as aforesaid, at public auction on the next day, to wit, March 11, 1908, at 12:30 o'clock p. m., and that unless additional security or credit could be given before 5 o'clock on the afternoon of March 10, 1908, he would authorize the auctioneers to include said bonds in the list of securities to be advertised for sale on the succeeding day.

"(20) That upon the following day, namely, March 11, 1908, at 12:30 o'clock p. m., there having been no sufficient intervening opportunity given to the said railroad company, or to others interested on its behalf, to enter into any adequate negotiations for the protection of said collateral, or to avail in the market of plans for the protection of the credit of said bonds, through provision for the payment of the interest thereon, which plans had been considered and discussed with, approved of, and urged by said Adams as aforesaid, and of which he was cognizant, said Edward D. Adams caused said first mortgage bonds, amounting in the aggregate to $4,000,000, par value, to be sold at public auction in the city of New York, and the same were sold, and said Edward D. Adams claims to have become the purchaser thereof, having bid therefor 53 per cent. of the par value of said bonds. That notwithstanding that said notes were secured by specific bonds, identified by numbers stamped thereon and referred to on the face of said notes, and that no power was contained in any one of said notes to offer the bonds securing it for sale together with bonds securing any other note, and notwithstanding that so to offer said security of one note together with the security for other notes as one block or item would tend to depreciate the price at which said bonds would be sold, yet the defendant offered or caused to be offered at said sale all of said bonds (being the number securing each of said notes) on such terms that the successful bidder for one block of 100 should have the privilege and option of taking the whole number of 4,000 bonds at the same price. That on said sale said Adams claimed to have become the successful bidder for the first block of 100 bonds, for the price of 53 per cent. of their par value, and thereupon claimed to exercise the said option of taking the whole number of 4,000 bonds at the same price, and said entire amount of said bonds was declared by the auctioneer to be sold to him at the price of 53 per cent. of their par value. That no other notice or advertisement of said sale, other than an inadequate and obscure item in an auctioneer's list printed in a newspaper published on the morning of the pretended sale, was made or given. The notice and advertisement so printed is attached hereto, marked 'Exhibit B,' and made a part hereof. That no notice whatsoever as to the terms or method of said sale was given except by the auctioneer at the time of offering said bonds for sale.

"(21) That thereafter, and on the 12th day of March, 1908, said Adams began an action on said notes in the Supreme Court of New York county against Western Maryland Railroad Company by serving on L. F. Timmerman, secretary of said company, a summons and complaint, in which the notes aforesaid were set forth and described, and in which it was alleged that the railroad company, defendant in said action, was then insolvent; that the plaintiff therein, pursuant to the authority granted to him by said promissory notes and each of them, caused the securities held as collateral thereto to be sold at public auction, and that the plaintiff therein became the purchaser thereof for

the sum of $2,120,000; that the expense of the sale amounted to $1,000, leaving $2,119,000 to be credited as a payment on account of said notes; that interest on said notes due and owing at the date of sale amounted to the sum of $35,-000, making a total of $3,035,000; that after crediting upon said notes the net proceeds of sale there remained unpaid thereon the principal sum of $916,000, for which said Adams, plaintiff in said action, demanded payment.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*

"(23) And your orator shows unto your honors that said defendant Adams and said Deutsche Bank were not justified in selling said bonds in the manner above recited, and in so doing acted contrary to equity and good conscience, in this: That at the time of said sale said bonds were temporarily depressed in value because of the recent appointment of a receiver of the railroad company; that the defendant Adams well knew the value of said bonds on account of the information that had been imparted to him during the course of the negotiations above described, and particularly on account of his knowledge that it was the purpose to prevent a default in the payment of interest due April 1, 1908, on said first mortgage bonds. That the offering of said bonds for sale in the manner aforesaid was in pursuance of a plan not only to secure said bonds at a price far below their intrinsic value, but to be enabled thereby to institute an action for the deficiency and obtain a preference over the other creditors of the railroad company, contrary to equity and good conscience."

The bill also alleges that the value of such bonds was in excess of 53 cents on the dollar of the par value and instances two or three sales for a higher price.

The defendant insists that no ground for equitable relief is stated; that there is full and complete remedy at law; that in the suit at law to recover the balance due on the notes the sale of the bonds and the validity of such sale are necessarily involved, and may and must be passed upon and determined; and that in the absence of fraud in the sale, of which there is no pretence, there is no ground for the interposition of a court of equity.

The bill of complaint shows that Adams gave full and ample notice that the notes must be paid at maturity. There is no allegation or pretence that he ever assented to anything different. Clearly he had the right to fully approve the proposition to secure an order from the court to pay the interest on the bonds falling due April 1st. By the very terms of the contract contained in the notes, Adams had the right to become the purchaser; to sell at a broker's board, at public sale or at private sale, without notice of intention to sell, or of the time or place of sale, and without demand of payment of the note. Not only did the railroad company have ample notice that the notes must be paid at maturity, but notice of the sale was given. Notice was given that the purchaser of one lot could at his option have the whole. No demand was made after the sale of one lot that the others be put up and offered separately. It is not alleged that any one was prevented from becoming a purchaser at a higher price by pursuing the mode adopted.

I do not find ground for equitable relief. In re Mertens, 15 Am. Bankr. Rep. 362, 366, 367, 144 Fed. 818, 75 C. C. A. 548, affirmed 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. And the burden of alleging and proving that this sale was unfair is upon the complainant. Hiscock v. Varick Bank, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. I fail to find any allegation of any fact tending to show that the sale

was either fraudulent or unfair. It seems to have been made upon due notice and in strict accordance with the contract.

The demurrer is sustained, with costs.