COMMERCIAL-GERMAN TRUST & SAVINGS BANK OF NEW ORLEANS, LOUISIANA *v.* CONNER.

[75 South. 445, Division B.]

1. BANKRUPTCY. *Burden of proof. Sale of pledge.*

   The burden of proving that a sale by a pledgee of the property of a bankrupt, made conformably to the contract of pledge was unfair, is on the trustee in bankrputcy of the pledgor who seeks to avoid the sale.

2. PLEDGES. *Purchase by pledgee. Agreement.*

   Under a pledge agreement, giving the pledgee the right to purchase the securities pledged, at their market value, or at any judicial or auction sale, the pledgee is not required if he purchases at an auction sale to pay the true market value since there is no limitation in the agreement upon the right of the pledgee to buy at a sale of the securities at auction.

3. SAME.

   The term market value in such a contract means the present market value, not prospective value, since owing to the customs of the banking business, neither of the parties could expect that the sale of the securities would be postponed for the coming of better and brighter financial weather.

APPEAL from the chancery court of Adams county.

HON. R. W. CUTRIER, Chancellor.

Receivership proceedings, wherein L. P. Conner, as receiver of the First Natchez Bank, filed exceptions to a claim of the Commercial Germania Trust & Savings Bank of New Orleans, Louisiana. From a decree rendered, the Trust & Savings Bank appeals.

The facts are fully stated in the opinion of the court.

*B. W. Crawford,* for appellant.

A mere statement of this case is its argument. In the first place the notes of the First Natchez Bank were dated at New Orleans, Louisiana, were payable at New Orleans, Louisiana, and were secured by the pledge of collaterals delivered to appellant at New Orleans, Louisiana, and held by the appellant in its portfolio in New Orleans, Louisiana. Consequently the law of the state of Louisiana applies and the said notes are governed as to their nature, validity, interpretation and effect by the laws of the state of Louisiana. 8 Corpus. Juris. 92.

Article 3165 of the Civil Code of Louisiana, as amended by Act No. 9, page 36, of 1872, provides that: "In all pledges of movable property, or rights, or credits, stock bonds or other movable property, it shall be lawful for the pledgor to authorize the sale or other disposition of the property pledged, in such manner as may be agreed upon by the parties without the intervention of courts of justice."

"C. Sale. 1. Right to sell. a. In General. Upon default by the pledgor in the performance of the principal obligation it becomes the right and the privilege of the pledgee to sell the pledged property at public auction, without judicial process, upon giving the pledgor reasonable notice of the time and place of sale. This right of the pledgee to sell is not a peculiar trust reposed in the creditor, but exists as an incident to the

contract of pledge and as a part of the security, unless an express agreement to the contrary be affirmatively shown. The right of the pledgee to sell may be exercised not only against the pledgor, but also against the receiver, or assignee of the pledgor for the benefit of his creditors, and all other persons claiming through the pledgor. Nor can the pledgee be required to postpone the sale on the ground that it would result in a sacrifice, the only remedy against the sale being to redeem the pledge.''

1 Cyc., pages 871 and 872, subject ''Pledges.'' This text cites among other cases the following: *Rasch* v. *His Creditors,* 1 K. Ann. 31; *Union Nat. Bank* v. *Forsyth,* 50 La. Ann. 770, 23 So. 917. Thus it is clear that the appellant had the right to sell, and had the right to become the purchaser at said sale.

''Where by the terms of the contract the pledgee is. authorized to buy at his own sale, a purchase by him in good faith and for a fair consideration is valid and binding on the pledgor.'' 31 Cyc., 879. ''Pledges.''

This right to sell and become the purchaser at the sale existed regardless of the fact that a receiver had been appointed for the First Natchez Bank. *Berry* v. *American White Lead & Color Works,* 107 La. 236, 31 So. Rep. 733.

Where the pledgor upon receiving due notice, makes no objection to the time or place of sale, he cannot claim after the sale that the time or place was improper. 31 Cyc. 877.

This point is taken up and fully discussed in the case of *Guinnburg* v. *Downs Company,* 165 Mass. 467, 43 N. E. 195, 52 Am. St. Rep. 525. Now as to the fairness of the sale. ''The burden of proving that a sale by a pledgee of the property of a bankrupt, made comfortably to the contract of pledge, was unfair, is on the trustee in bankruptcy of the pledgor who seeks to avoid the sale.'' *Hiscock* v. *Varick Bank,* 206 U. S. 28, 27

.Sup. Ct. Rep. 681. The same rule would apply in this case. In the instant case, however, no unfairness is shown or charged, but appellee rests .his action on the fact that the sale was made in New Orleans.

We think on this record that this court has but one course and that is to reverse the decree of the chancellor. We have shown that the sale was fair and made in .conformity to the contract of pledge, therefore, we respectfully contend that this case should be reversed and decree rendered here upholding the validity of the sale and ordering the payment of dividends on the probated account of appellant as registered and allowed.

*L. T. Kennedy,* for appellee.

The order of the lower court in this cause should be permitted to stand for the following reasons: 1. No assignment of error has been filed herein, as required by law. 2. The order or decree of the lower court is an interlocutory order and neither the right to appeal was obtained nor the appeal perfected in the time required by law. 3. The findings of the chancellor on the facts presented by the evidence will not be disturbed by this court.

. COOK, P. J., delivered the opinion of the court.

On October 29, 1913, the First Natchez Bank closed its doors, and the assets of said bank were placed in the hands of a receiver by the chancery court. At this time the insolvent bank was indebted to the Commercial-Germania Trust & Savings Bank of New Orleans, La., appellant here, in the sum of forty thousand dollars, evidenced by two promissory notes for the sum of twenty thousand dollars each, one dated May 26, 1913, and due November 3, 1913, and the other dated June 3, 1913, and due November 25th after date. These notes were given for money loaned to the Natchez Bank by the New Orleans Bank, and were secured by a pledge

of certain collaterals owned by the Natchez Bank, a list of which appears on the back of each note. The written contract of pledge of the collateral is in these words, viz.:

"The note is secured by pledge and delivery of securities mentioned on the reverse hereof, and any securities that may be substituted therefor, and any and all other securities that may have been pledged already to this bank, should said securities decline in value the maker of this note hereby agrees, within twenty-four hours after demand on him to that effect by the holder of this note, to furnish and pledge additional securities satisfactory to the holder of this note, to cover such decline. And the failure or refusal by the maker to furnish such additional securities when so called for shall at once mature this note and pledge, without putting in default.

"Should this note be paid at maturity, or when it becomes due by failure to furnish additional securities, as above provided, or for any other reason, the then holder thereof is hereby authorized to sell the pledged securities, at public or private sale, without recourse to judicial proceedings, and is hereby irrevocably authorized to transfer any shares of stock, or other securities, on the books of the company issuing same to purchaser under such public or private sale.

"The proceeds of the sale of said pledge securities shall be applied (1) to the payment of all costs and commissions for selling; (2) to the payment of this note, in principal and interest and the five per cent. attorney's fees below stipulated; and (3) to the payment of any other indebtedness, then due or thereafter to become due, up to the sum of two hundred and fifty thousand dollars ($250,000), by the maker of this note to said Commercial-Germania Trust & Savings Bank.

"The holder of this note shall have the right to purchase the pledged securities at their market value,

if there be any market value, or at any judicial or auction sale thereof, or when sold on the Stock Exchange of New Orleans. The undersigned do hereby further authorize the said bank at its option, at any time, to appropriate and apply to the payment of any of said liabilities, whether now existing or hereafter in the hands of said bank, on deposit or otherwise, to the credit of or belonging to the undersigned, whether such liabilities are then due or not due. Should this note not be paid at maturity, or when due as above, or should it become necessary to employ an attorney to make or enforce the same, or should this note be placed in the hands of an attorney for collection, the maker · shall pay the fees of such attorney, to be estimated at five per cent. on the amount then due on this note, which attorney's fees are secured by this pledge.

"At the maturity of this note, or when otherwise due as provided, any money, stocks, bonds, or other property of any kind whatsoever, on deposit or otherwise to the credit of the maker on the books of said Commercial-Germania Trust & Savings Bank, or in its possession, shall at once stand applied to the payment of this note, or any other indebtedness, up to the limit above stated, unless it be otherwise paid. In the event of the insolvency of the undersigned, this note and all the said liability shall become due, and be immediately due and payable, without demand or notice, notwithstanding any credit or time allowed the undersigned by any instrument evidencing any of said liabilities."

After a critical examination of the foregoing contract, we have been unable to discover any evidence that the draftsman overlooked anything. The interests of the creditor bank seems to have been carefully safeguarded. After the failure of the Natchez Bank, the signer of the foregoing contract, the New Orleans Bank proceeded to collect the collectable pledged collaterals and credited same on the notes.

On December 31, 1913, the receiver of the Natchez Bank gave notice to all creditors that, unless their claims were probated and registered within one year, they would be forever barred. On October 27, 1914, the New Orleans Bank wrote the receiver of the Natchez Bank this letter:

"October 27, 1914.

"Mr. L. P. Conner, Receiver, First Natchez Bank, Natchez, Miss.—Dear Sir: This is to advise you that, in accordance with agreement of pledge of the First Natchez Bank, we will sell at our banking house, No. 611 Common street, on Wednesday, October 4, at noon, the following described notes, held as collateral security to their obligation to this bank, to the highest bidder, ourselves, if necessary, holding the said bank or receivers for the unpaid balance, in any:

| | |
|---|---:|
| Note of Tensas River Planting Co | $10,000.00 |
| Note of R. Lee Parker | 2,567.78 |
| Note of B. F. Young | 463.64 |
| Note of Concordia Oil Mill Co., Ltd | 5,000.00 |
| Note of Ashland Merc. & Pltg. Co | 2,216.01 |
| Note of Adams Land Co | 2,536.55 |
| Two notes Postlethwaite-Stewart Co | 516.53 |
| Note of E. L. Collins | 1,000.00 |
| Note of Ballina Pltg. Co | 4,231.00 |

"We are advising you in ample time, so that you may be present at this sale, or have a representative, if you so desire.

"Yours very truly,

"[Signed]  G. Owen Vincent,

"Vice-Pres. & Cashier."

The receiver replied to this letter on November 3d, calling attention to the fact that the date fixed for the sale of the collateral had already passed before the date of the letter advising him of the proposed sale. It was evident that the date, October 4th, mentioned in the letter to the receiver, was a clerical error, and

the New Orleans Bank, on the receipt of the receivor's reply, fixed another date for the sale of the securities. In the end, the collaterals were sold under the terms of the contract at public auction, and were purchased by the New Orleans Bank at a price less than the receiver thought they were worth. The receiver declined to appear at the sale, because he had no authority to do so, and because he had no funds on hand which he could use for that purpose.

After crediting the notes with the amount for which the collateral was sold, the creditor bank probated the balance according to the decree entered by the chancellor, whereupon the receiver of the insolvent bank filed an answer to probated notes, denying that the collateral had been purchased at the market value, and ask that the title to the collateral be declared to be in the insolvent bank, and that all amounts collected by the credit bank on said notes claimed to have been purchased by it be credited on the principal notes. Evidence was taken, and the chancellor entered a decree according to prayer of the receiver, and ordered an accounting.

It seems that the receiver of the insolvent bank has placed some stress upon the letter of the creditor bank, in which it said, if it was forced to buy in the securities at the auction sale, it would not pay more for them than they were compelled to pay. This statement had the merit of frankness and probable truth. It is rare that purchasers of anything pay more than they have to pay, and we think that we may disregard this obviously truthful statement in arriving at a proper solution of this case.

So far as we have been able to see from the record, the collateral was sold and purchased strictly within the terms of the contract. There is nothing in the record to suggest that the creditor bank suppressed or discouraged bidding at the sale; but, on the contrary, the record discloses the undisputed fact that the bank endeavored to

secure bidders. "The burden of proving that a sale by a pledgee of the property of a bankrupt, made conformably to the contract of pledge, was unfair, is on the trustee in bankruptcy of the pledgor, who seeks to avoid the sale." *Hiscock* v. *Varick Bank,* 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. "The holder of this note shall have the right to purchase the pledged securities at their market value, if there is any market value, or at any judicial or auction sale." Thus speak the contract of pledge. It is not clear why the chancellor nullified the sale of the notes in question, unless he construed the contract to mean that the holder of the notes could only obtain title to the pledged notes at the auction sale by paying for them their market value.

We do not so construe the contract. There does not seem to be any limitation upon the right of the pledgee to buy at auction sale. But if we construe the contract to mean that the pledgee could not purchase the pledged securities at all, unless he paid the "market value, if there is any market value," we have been unable to find anything in the record that shows the securities had any market value at the time they were sold. Taking the evidence in its strongest aspect, it is clear that, if the securities had any market value at all, it was entirely prospective, and largely speculative.

The creditor had the right to collect the principal notes when they were due, and was under no obligations to postpone the sale of the securities upon the possibility that some time in the future their market value would be greater. It is not easy to define the term "market value," but, when we were called upon to define the meaning of the term, we, of course, must take into consideration the nature of the contract, the business engaged in by the parties to the contract, and the purpose of the contract. Banks must turn over their capital frequently, if they hope to survive. It is hardly possible that the parties to this contract contemplated

that the contract would not be enforced until the times got better.

May we not say with confidence that "market value" in this contract meant present value, not prospective value? Time was of the essence of this contract, and when we come to consider the situation of the parties thereto, and the customs of the business they were engaged in, it seems reasonably certain that neither of them expected that the sale of the securities would be postponded for the coming of better and brighter financial weather. We can sympathize with the purpose of the chancellor to conserve the assets of the insolvent bank for equitable distribution among the victims of the catastrophe which follows in the wake of torpedoed banks, but we must not sacrifice contractual rights to the common good.

*Reversed and remanded.*