**BAER v. SECURITY TRUST CO. et al.***

## In re STRATFORD SPRINGS CO.

Circuit Court of Appeals, Fourth Circuit.
April 9, 1929.

No. 2796.

Howard D. Matthews and Charles J. Schuck, both of Wheeling, W. Va. (W. C. Grimes, J. Bernard Handlan, and G. Alan Garden, all of Wheeling, W. Va., on the brief), for appellant.

James W. Ewing, of Wheeling, W. Va. (P. J. McGinley and Russell A. Klieves, both of Wheeling, W. Va., on the brief), for appellees.

Before PARKER and NORTHCOTT, Circuit Judges, and COLEMAN, District Judge.

WILLIAM C. COLEMAN, District Judge. This is an appeal from an order of the District Court of the United States for the Northern District of West Virginia, at Wheeling, in bankruptcy. After hearing upon exceptions by various secured and unsecured creditors to the allowance of a secured claim filed by appellant in the amount of $51,675 and interest, the referee found that appellant's claim to the extent of $33,500 with interest should be allowed, but the District Court reversed the referee, sustained

the exceptions, and disallowed the entire claim of appellant.

There are nine assignments of error directed to the court's action with respect to various separate findings of the referee. All of the assignments may be summarized as claiming (1) that the court was in error in not reversing the referee in his finding that appellant's claim should be reduced from $51,675, with interest, to $33,500, with interest; and (2) that the court should, in any event, have affirmed the finding of the referee that appellant was entitled to his claim for the reduced amount.

The Stratford Springs Company, a West Virginia corporation, had, for a number of years prior to its adjudication in bankruptcy, which occurred May 6, 1924, been engaged in operating a bottling plant in Triadelphia district, Ohio county, W. Va., where it bottled and sold drinking water to the public. The company owned 37 acres of land on which there had formerly been a hotel. This company was the successor of the Stratford Magnesia Springs Company which, in February, 1918, had issued against this land, 150 6 per cent. five-year, first mortgage bonds, each of the denomination of $500, making a total face value of $75,000. In December, 1922, the Stratford Springs Company issued 300 second mortgage bonds with the same interest rate, face value, and maturity date, against the same land in the amount of $150,000. Because of the company's financial difficulties, which had been long existent, it had been endeavoring for some time to dispose of its real estate, retaining only so much as might be necessary to conduct its bottling plant. In furtherance of this plan, a reorganization of the company was attempted, and J. W. Adams, its secretary, asked the appellant, Ben S. Baer, who was engaged in the warehouse business in Wheeling, and not a stockholder of the Stratford Springs Company, to assist him. Two or more firms, which made a business of reorganizing companies, were consulted, but no satisfactory plan to keep the company going was agreed to. Thereupon appellant, Baer, prepared a plan of his own, under which the company's land was to go to the bondholders, except one-half acre and the water rights from the property, which were to be deeded to a reorganized bottling works company, free and clear of all liens. The plan was contingent upon all of the creditors accepting 40 cents on the dollar for their accounts, payment to be made in shares of the new company, which was to be capitalized at $100,000. The plan was submitted by appellant to creditors, and purported to come from a reorganization committee, whose membership, however, was not disclosed, nor does such a committee appear ever to have actually existed.

On August 13, 1923, Adams, on behalf of the Stratford Springs Company, and appellant entered into an agreement, by the terms of which it was stipulated that, upon the formation of a certain corporation, to be called the Stratford Springs Holding Company, or given such other name as might be mutually agreed upon, appellant should have a 51 per cent. interest in this new company, and the balance, 49 per cent., should belong to Adams. Supplementary to this agreement, Adams and appellant entered into a second agreement, under the terms of which appellant was to use his best efforts towards bringing about the construction of a hotel upon the land of the Stratford Springs Company, in consideration and in furtherance of which Adams obligated himself to cause the real estate and personal property, including the good will, of that company, to be transferred to the appellant and by him to the new company.

It appears that on August 23, 1923, a stockholders' meeting was duly held at which the aforegoing agreements were made known to stockholders; they acquiesced in them, and resolutions were passed authorizing the board of directors to make such disposition of the assets of the company as, in their judgment, might seem proper. However, all of the unsecured creditors of the Stratford Springs Company did not accept the offer which was made to them, so the plan for organizing the bottling works company was abandoned, as was the rest of the plan to construct a hotel upon the land which was to become the property of the new company to be formed. Accordingly, the appellant returned to the various unsecured creditors their claims which had been deposited with him under the reorganization plan.

Thereafter, in October 1923, the appellant acquired from the Bank of Cameron a collateral note of the Stratford Springs Company, dated March 10, 1922, payable on demand to the order of that bank, for the sum of $20,000 and interest, secured by 50 of the first mortgage 6 per cent. bonds of the Stratford Magnesia Springs Company of a total par value of $25,000, which formed part of the $75,000 bond issue above referred to. The appellant held this note and collateral until March 18, 1924, when he purported to sell the collateral to himself through a brokerage firm in Wheeling, costing him only the

usual broker's commission. On October 24, 1923, appellant also acquired from the Wheeling Bank & Trust Company, four collateral demand notes for the sum of $12,000 and interest, which were secured by 25 of the bonds of the Stratford Magnesia Spring Company above referred to, of the face value of $12,500. Temporarily, appellant used these latter bonds as collateral against his personal note at the same bank, until, on March 18, 1924, this collateral having been returned to him, he purported to sell it to himself, as he had the collateral for the other note. In the spring of 1923, appellant had also acquired six bonds of the Stratford Magnesia Springs Company from Adams, for which appellant paid $1,500. The evidence is irreconcilably conflicting as to whether these bonds were purchased outright, or merely given as collateral.

As a result of an involuntary petition filed against it April 15, 1924, the Stratford Springs Company was adjudicated a bankrupt on May 6th. On March 6, 1925, appellant filed his proof of claim in the bankruptcy proceedings, amounting to $51,675, with interest from February 1, 1925, at 6 per cent.; his claim being evidenced as follows: 81 bonds (acquired as aforesaid) $40,500; unpaid coupons on 75 bonds, $10,875; and interest, $300.

It is now necessary to examine the six findings of the referee, and the specific ruling of the court with respect to each of them. The referee found, first, that the Wheeling Bank & Trust Company and the Bank of Cameron sold to the appellant the notes in controversy for $12,000 and $20,000, respectively. The court reversed this finding, holding that appellant, pursuant to a fraudulent scheme, paid off and discharged the notes as a mere volunteer; that therefore he was not a purchaser of them, and never became liable for their payment. The referee next found that the appellant had purchased the notes in accordance with the agreement between himself and Adams, whereby appellant was to purchase and hold the notes and collateral until a reorganization of the Springs Company could be effected; that he was obligated not to sell any of the bonds but to hold them as collateral security for the payment of the notes; and that thus the alleged sale of all the bonds in controversy through a broker was contrary to the agreement, and also was contrary to the terms of the notes themselves. This finding was also reversed by the court, on the ground that, since the appellant had never become the owner of the notes, but had voluntarily paid them off pursuant to his agreement with Adams, appellant should have returned the collateral to the company. The court further held that the alleged sale of the bonds through a broker was not in accordance with the agreement with Adams, nor in accordance with the terms of the notes themselves, and that therefore the pretended sale was in fraud of the bankrupt's creditors and void. In the third finding of the referee, the court concurred, namely, that the six bonds held by appellant were given him by Adams as collateral for a loan to the company of $1,500, and were not authorized to be sold. The court also concurred in the fourth finding of the referee that the coupons attached to the bonds never became the property of the appellant and therefore should not be allowed as any part of his claim. The fifth and sixth findings of the referee related to a reduction of appellant's claim from the total sum of $51,675 with interest, to $33,500 with interest. The court did not analyze these findings, since it held, as just explained, that appellant's entire claim should be disallowed, because predicated upon a fraudulent claim of ownership of the bonds.

Summarized and shorn of all minor points, the finding of the District Court is that appellant's entire claim must be disallowed because he never became the rightful owner of any of the collateral bonds, but merely acquired them through discharging the notes in a fraudulent manner, namely, that, after discharging the notes, appellant's agreement, both verbal and written, made with the company, through its secretary, Mr. Adams, obligated him to return the collateral to the company.

With this conclusion of the lower court we cannot agree, because we find in the record no evidence sufficient to warrant our holding either (1) that appellant had obligated himself not to purchase, in his own right, the company's notes and their collateral; or (2) that such a purchase, if permitted, irrespective of agreement, would be in fraud of the company's creditors. In order that we may immediately dispose of these two points, we will postpone consideration of the further questions, (1) Did appellant in fact purchase the notes and collateral, or did he merely discharge the notes for the benefit of the company? and (2) Was his subsequent alleged sale of the collateral to himself valid?

There is nothing in the agreements which the appellant made with Adams, representing the company, that either expressly or by implication prohibited appellant from acquiring, as a personal investment, bonds of

the company. There is no mention whatsoever of these securities in the agreements. In the so-called reorganization committee's proposal to creditors, it is set forth that the reorganization contemplates the bondholders taking the company's land in payment of their bonds. As a matter of fact, Adams expressly authorized, by letter addressed to the Wheeling Bank & Trust Company, the sale to appellant of the four notes with collateral held by that institution. The word "sale" was used in the letter of authorization without qualification. In the face of this fact, and the further fact that Adams never demanded any of the collateral from appellant, and that appellant made written demand upon the company to pay the notes, otherwise they would be liquidated by sale of the collateral, which demand was received by Adams, the latter's testimony that he meant merely to concur in appellant *paying off* (that is, extinguishing) the indebtedness on the notes, is entitled to little weight.

■ Turning next to the question whether, admitting there was no express prohibition, appellant had a right to acquire for himself the notes and collateral, we find a failure of proof of such circumstances as would justify us in declaring that such acquisition would be in fraud of creditors, secured or unsecured, or of the stockholders of the bankrupt company. As to the bondholders, appellant practised no fraud upon them. They are in no worse position than they would have been in had the banks retained the notes and collateral and filed their claims. The company originally benefited by the money obtained on the notes. Appellant in turn gave value for them, and to that extent is entitled to share ratably with the other bondholders.

Next, as to unsecured creditors, whose claims amount to approximately $70,000, they were not deceived or defrauded. They were told what they might receive under the proposed reorganization plan (that is, 40 cents on the dollar for their claims) payable in the stock of a company to be formed. They were told that the bondholders would be paid in land of the company. Lastly, as to the stockholders, it is sufficient to point out that, at a meeting duly called and held, they were advised of the agreements between appellant and Adams, saw fit to leave the company's affairs in their hands, and must have known that, whether appellant did or did not acquire any of the company's bonds in his own right, the outstanding bonded indebtedness alone, not to mention unsecured creditors' claims, was so far in excess of the company's assets, that they could not reasonably hope to be paid anything in liquidation of their stock.

■ Fraud is not to be presumed. It must be proved. Hiscock v. Varick Bank, 206 U. S. 28, 27 S. Ct. 681, 51 L. Ed. 945; Jones v. Simpson, 116 U. S. 609, 615, 6 S. Ct. 538, 29 L. Ed. 742. The methods adopted by appellant in his efforts to obtain control of the company, were, it is true, not above criticism, but, under all the circumstances, nothing that he did, with respect to the acquisition of the notes, was tantamount to fraud.

We now come to the question, Did appellant in fact purchase or merely pay off the notes, as a volunteer, for the company? The referee found that appellant did in fact purchase all the notes, but that, by virtue of his agreement with Adams, he was obligated not to sell the collateral bonds, acquired with the notes, but to hold them merely as security for payment of the notes by the company, if and when the company's contemplated reorganization was effected. The lower court rejected this finding and held that appellant never became a purchaser of the notes, but discharged them as a mere volunteer.

■ The official of each bank having charge of the transactions with appellant testified that his bank intended to transfer, and did transfer, to appellant all of its right, title, and interest in and to the notes and collateral. In the case of the Bank of Cameron, it was paid cash for the value of the note, $20,000, by another bank at appellant's direction. In the case of the Wheeling Bank & Trust Company, after delivering to appellant the four notes and attached collateral bonds, the bank took back from him both the notes and collateral as security for appellant's two personal notes for $12,000, which he gave in payment for the four notes. These facts, together with the fact, heretofore alluded to, that Adams gave express written authorization to the trust company to sell the notes with collateral to appellant, seem entirely adequate to refute the contention that appellant did not purchase the notes. This argument appears even less tenable when we analyze the entire transaction had with the trust company. That is to say, it is not to be assumed that a bank would take, as did the trust company, as collateral for a customer's personal loans, notes of a third party, if they had in fact been paid off out of the proceeds of such personal loans, and also bonds which, by virtue of the payment of such notes, became the property of such third party.

■ The relation of a stranger to commercial paper who puts up his money and acquires possession of the paper is one of in-

tention. The transaction is presumptively a purchase and not a payment or discharge of the instrument. Dodge v. Freedman's Savings & Trust Co., 93 U. S. 379, 23 L. Ed. 920; Carter v. Burr, 113 U. S. 737, 5 S. Ct. 713, 28 L. Ed. 1147; Wood v. Guarantee Trust Co., 128 U. S. 416, 9 S. Ct. 131, 32 L. Ed. 472. This is entirely consistent with the provisions of the Uniform Negotiable Instruments Act, adopted in West Virginia, relating to the discharge of instruments. See 1923 Barnes' West Virginia Code, Annotated, c. 98A, § 119. See, also, Kelley v. Briggs (Mo. App.) 290 S. W. 105.

█ We therefore conclude that the lower court was in error in not sustaining the findings of the referee to the extent that appellant could and did honestly purchase the notes. But there still remains to be decided the question whether the subsequent sale of the collateral bonds to himself—a mere paper transaction through the broker's office—was a bona fide sale such as appellant might make. The referee found that this was an improper transaction, because in violation of his agreement with Adams. We concur in the result, but upon somewhat different reasoning. That is to say, we believe that, while the referee was correct in reducing the amount of appellant's allowable claim to the total sum actually expended by him, with interest, such reduction is necessary, not because appellant had agreed not to sell the collateral, to himself or to others, in liquidation of the notes which he had bought, but because, as the lower court found, a bona fide sale did not in fact occur. A provision on the face of each note gave authority to the holder to sell the collateral and to purchase it, himself, "upon the nonperformance of this promise," namely, upon failure to pay the principal or interest of the note according to its terms, and no demand was necessary, although such appears to have been made. However, the transaction was not in fact a sale, but a mere colorable paper transaction. The best evidence of this is that the broker's record of the transaction shows that appellant sold the bonds to himself for an excess of $5,500 over what he had paid for the notes. That is, the sale and purchase purport to have been made at the full face value of the 75 bonds—$37,500—whereas appellant only paid $32,000 for the collateral notes. Clearly it would be unjust to other creditors to allow appellant to profit at their expense in this way. For the same reason, therefore, the court was correct in approving the fourth finding of the referee, that the coupons attached to the collateral bonds should not be allowed as part of appellant's claim, because, were his claim allowed for anything more than what he had actually paid for the notes, with interest, it would be in fraud of other creditors.

█ Finally, with respect to the third finding of the referee, which the lower court confirmed, that finding was to the effect that the six bonds acquired by the appellant from Adams at the time appellant advanced $1,500 to the company, were merely collateral in his hands. As already pointed out, the testimony respecting the exact nature of this transaction is in hopeless contradiction, and, under the circumstances, we see no reason to disturb the lower court's conclusion.

For the foregoing reasons, we find the District Court to have been in error in reversing the action of the referee, and its judgment is accordingly reversed.