## In re THOMPSON.

## In re MARKELL.

(District Court. W. D. Pennsylvania. October 20, 1921.)

No. 8790.

1. **Bankruptcy ⬦339—Payment involved where claim is filed in bankruptcy court.**

    One presenting a claim in the bankruptcy court for payment necessarily asks the court to adjudicate it, which involves the question of validity and payment, and trustee in bankruptcy may set up payment, notwithstanding claimant claims to have in the records, offered in its support, conclusive evidence of its validity and amount.

2. **Pledges ⬦56(5)—Pledgee, selling property, must comply strictly with terms of contract.**

    A pledgee of securities, in selling the same, must comply strictly with the terms of notes which constitute the contract under which the pledge is sold, because the pledgee is a trustee of the property pledged, first for himself to the extent of his claim, and for the pledgor for the remainder, if any.

3. **Pledges ⬦2—Local laws govern.**

    The law governing sale of pledges is local, and the law of the state where a pledge is given and sold applies.

4. **Pledges ⬦56(6)—Authority of pledgee to become purchaser to be in plain terms.**

    Authority of pledgee to become the purchaser of the pledge at a sale thereof must be given in very plain terms in Pennsylvania.

5. **Pledges ⬦56(5)—Public sale contemplates competetive bidding.**

    A public sale of a pledge contemplates competitive bidding, and a sale of a pledge in the office of pledgee's attorney, where there was only present the attorney, pledgee, and a third person, who did not desire to bid, was not a public sale.

6. **Pledges ⬦56(1)—Pledgee cannot sacrifice property to injury of creditors of pledgor.**

    Pledgee, selling property, must exercise good faith, taking no undue advantage of his trusteeship, to his own benefit and the injury of creditors of the pledgor.

---

**7. Judgment ⬅516—Against bankrupt could be attacked collaterally by creditors defrauded thereby.**

A collusive judgment, obtained against bankrupt before proceedings in bankruptcy were begun, may be attacked collaterally by judgment or execution creditors defrauded thereby.

**8. Bankruptcy ⬅339—Judgment may be collaterally attacked by trustee in bankruptcy.**

Where judgment was obtained against bankrupt before bankruptcy proceedings on mortgage foreclosure, and the land was sold by trustee in bankruptcy, and mortgagee filed claim for unpaid portion of judgment, which he claimed constituted a lien on the proceeds in the hands of the trustee, the trustee, as a defense, could claim that such judgment had been paid, in that the mortgagee had sacrificed securities held by him, and had purchased them at an illegal sale for a nominal amount, and that to allow him a lien on the funds in the hands of the trustee would amount to payment twice of his debt.

In Bankruptcy. In the matter of Josiah Van Kirk Thompson, bankrupt. Order of referee awarding a sum to F. E. Markell, claimant, reversed.

Weil & Thorp, of Pittsburgh, Pa., for receivers.

E. C. Higbee, of Uniontown, Pa., for claimant.

THOMSON, District Judge. We have, on certificate for review, the question of the correctness of the referee's action in allowing the claim of F. E. Markell in the sum of $19,600.39. The facts in their chronological order, are these:

In 1907, three notes of Jasper Augustine were accepted by the Citizens' National Bank of Connellsville, two for $16,000 each, and one for $18,000, aggregating $50,000, for which the bank paid $42,500. Interest being paid on the notes to 1909, Thompson, the bankrupt, on the purchase of certain coal property, assumed the payment of these notes. In 1913, Thompson borrowed from the claimant, Markell, who was the president of the said Citizens' National Bank, $80,000 in two sums, $50,000 on January 2d and $30,000 on September 12th, giving his notes therefor, with collateral security, namely: On the first note, $50,000 worth of Isabella Coke Company bonds, and on the second note $27,000 worth of Poland Coal Company bonds and $13,000 of Pittsburgh & Westmoreland Coal Company bonds. As additional security, he gave to Markell a mortgage on certain coal property in the sum of $80,000. Thus, for the loan of $50,000, Markell held Thompson's notes for $80,000, bonds of the face value of $90,000, and a mortgage for $80,000.

On December 7, 1915, Markell obtained judgments by suit on his two notes of $50,000 and $30,000, respectively, in the court of common pleas of Fayette county. At that time, Thompson was in the hands of receivers appointed by the Fayette county court. The receivers were not made parties to the suit, and, no appearance being entered for the defendant, the judgments were taken by default.

On December 20, 1915, Markell sold the bonds above enumerated, which he held as collateral on said two notes, and bought them in for $5,000. In the first note of $30,000 there was authority given to sell

at public or private sale, without demand, advertisement, or notice. The second note gave power to Markell to sell and transfer at public or private sale. Notice by advertisement was given of the sale, which took place in the office of his attorney: no one but his attorneys and claimant being present, except a stranger from Uniontown, who said he did not want to bid. Mr. Markell, the claimant, being the only bidder, he obtained the securities for $5,000.

In May, 1917, a writ of sci. fa. was issued on the mortgage, and on August 2d, following, judgment entered thereon for $89,940, being a few days prior to the adjudication of the bankrupt. On September 5, 1918, the claimant went into the bankrupt court before Referee J. G. Carroll, claiming $80,000, with interest from October 10, 1914, less a credit of $5,000 as of December 20, 1915, being the date when the bonds were sold.

On August 2, 1919, Markell received on his mortgages $81,188.20, from the proceeds of the sale by the trustees of two of the tracts embraced in the mortgage. Afterwards the trustees, by proceedings in this court, sold the other tract embraced in the mortgage, free, clear, and discharged of all liens; the liens on the land being transferred to the fund, which is more than sufficient to pay the balance claimed on the mortgage, to wit, $19,600.39.

On July 15, 1920, the claimant, through his attorney, Mr. Higbee, appeared before William R. Blair, Esq., referee, and presented the balance claimed upon the mortgage. His position was that he was not claiming anything whatever out of the bankrupt's estate, but was sitting on his security; that, inasmuch as the land which constituted that security has been sold discharged of the lien, and the lien transferred to the fund, for the purpose of showing his lien on the fund, and its amount, he offered the mortgage, the proceedings on the sci. fa. resulting in judgment, and the petition of the trustees for confirmation of the sale which produced the fund in question, and the decree confirming the same.

To this offer the trustees made numerous objections, among others, that under the circumstances the sale of the securities was fraudulent, and the value of the same, which claimant thus received and holds, was much more than sufficient to pay the balance claimed. The referee overruled the objections and allowed the claim, basing his ruling on two grounds: First, that the bankruptcy court has no jurisdiction to hear the defense to the Markell claim; that by reason of the sale of the securities, Markell held them under an adverse claim of title, which, under the decisions of the Supreme Court in Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175, and Mitchell v. McClure, 178 U. S. 539, 29 Sup. Ct. 1000, 44 L. Ed. 1182, must be tried in another forum; and, second, because all such matters, if proven, were matters of defense, and the judgments offered in evidence are conclusive against them.

The evidence shows that the securities sold were of the value of about $60,000. In addition, the testimony shows, whatever may be its bearing on the questions involved, that on the day the bonds were sold Markell wrote Thompson a letter, agreeing to "hold these bonds until

the 1st day of April, 1916, to be returned to you on payment of said notes, with interest"; that the notes were not paid within the time specified; that, after the adjudication in bankruptcy, Markell said he would deliver all the collateral he had purchased, if his claim and that of the bank were paid; that Mr. Scrugham, one of the trustees, stated to the attorney for the claimant that the trustees were in funds, and would pay the claim, if Markell would turn over the collateral in his possession.

The respective claims of the bank and that of Markell appear, from the records before us, to be separate and distinct. But, whatever may be the fact, the bank's claim having been withdrawn before the referee, the claim of Markell must be considered alone. The claimant having received on his loans $81,188 in money, and securities of the value of $60,000, or $40,000 more than the indebtedness, can he, under the facts stated, as against objecting creditors, get the decree of the court for the payment of $19,000 more? Some inexorable rule of law must be invoked, some insuperable barrier against the assertion of equities must be interposed, to sustain such a contention. Such barrier defendant's counsel finds in the alleged conclusiveness of the judgment obtained on the sci. fa. on the mortgage. The argument is: The claimant acquired a good title to the securities at the sale; that Thompson made no effort to impeach it, and thus in legal effect ratified it; that the judgment on the mortgage, entered before the proceedings in bankruptcy, adjudicated and forever barred all question which could have been raised as to the validity of the sale or the amount due, not only against Thompson, but against the trustees as well. He further asserts that Markell is not in the bankruptcy court, seeks nothing out of the fund to be distributed among unsecured creditors, but is merely asking payment of the lien on the fund which the trustees hold subject to its payment; that, title to the securities being held adversely to the estate, the bankruptcy court is without jurisdiction to try any question concerning it.

[1] On the question of jurisdiction, the cases of Bardes v. Bank, 178 U. S. 524, 20 Sup. Ct. 1000, 44 L. Ed. 1175, and Mitchell v. McClure, 178 U. S. 539, 20 Sup. Ct. 1000, 44 L. Ed. 1182, do not apply. The trustees are not making a claim to property adverse to the claimant. They are not asserting title to the collateral sold, attempting to recover it back, or to set aside the alleged illegal sale. They are simply setting up an equitable defense against the claim. They are asserting payment and asking a court of equity to refuse payment of a claim already paid in full.

The claimant is in the bankruptcy court when he presents his claim for payment. When he introduces his claim, he necessarily asks the court to adjudicate it, which involves the question of validity and payment. This is none the less true because he claims to have, in the records offered in its support, conclusive evidence of its validity and amount. Whether he has such conclusive evidence, either as to validity or amount, was a question for the referee to decide, and for this court on review. The referee held that, even assuming jurisdiction of the defense, the judgments conclusively barred all parties from defending.

Thus it is clear that the claimant was in the bankruptcy court, submitted his claim for adjudication, and succeeded in securing its allowance by the referee. Being in the bankruptcy court, a court of equity powers, which had jurisdiction of the parties and the subject-matter, it was his duty to hear any equitable defense offered to the claim, and to decree accordingly.

[2] The judgments on the notes, entered before the sale of the bonds, adjudicated nothing involved in this issue, and may be put aside. Whether the sale of the securities was legal depends on whether the pledgee complied strictly with the terms of the notes, which constituted the contract under which the pledge was sold; this because the pledgee is a trustee of the property pledged, first for himself to the extent of his claim, and for the pledgor for the remainder, if any. Cadwalader's Appeal, 64 Pa. 293; Sitgreaves v. Bank, 49 Pa. 359.

[3, 4] With the first note was $50,000 worth of bonds. There was authority in this note to sell publicly or privately, without demand or notice, and to purchase as any other bidder at any public sale. It also gave to the holder the "right to call for additional security from time to time in case there should be a decline in the market value thereof." While the second note, with $40,000 worth of collateral, gave the power to sell at private or public sale, it gave no power to the pledgee to become a bidder at his own sale. Without such power, he could not become a bidder at the sale. The law governing the pledge is local, and the law of Pennsylvania applies. Hiscock v. Bank of New York, 206 U. S. 28, 27 Sup. Ct. 681, 51 L. Ed. 945. "Authority to the pledgee to become the purchaser, must be given in very plain terms." Hamilton v. Schaack, 16 N. Y. Weekly Digest, 423.

[5] The bonds under both notes were sold in the office of the pledgee's attorney, there being present only his attorney, Mr. Mathews, the pledgee, and a third person, who did not desire to bid. Mr. Mathews was the auctioneer, and there was but one bid, that of the pledgee. In a private sale there is simply an agreement as to the price. In a public sale the price is supposed to be fixed, not by agreement, but as the result of competitive bidding. The principles governing a public sale are well set forth in Hibler v. Hoag, 1 Watts & S. 552, wherein the court says:

"In every sort of auction, there are either successive bids for the property, or successive offerings of it at different prices, in a way to promote competition. By the usual practice, the bidders successively bid more and more, until the highest point is attained. * * * In the instance under consideration, there was no bidding at all; the property being offered once and for all, to any one who would take it for the sum named. What else does the ordinary retailer, except that he does not proclaim his price aloud, or take the same measures to attract the public attention? * * * What, then, is understood by an auction, according to the usages of Pennsylvania? It is a sale by consecutive bidding, intended to reach the highest price of the article by competition for it; and such a sale the Legislature certainly had in its view."

If such standard were applied here, the sale would not meet the requirements of a public sale. If the sale was not in legal effect a public sale, then the pledgee had no right to bid. The sale would be illegal,

and pass no title, and the pledgee would be answerable for the securities illegally appropriated under it. But, assuming that the sale passed title, what then? Whether the price fixed by the bid is conclusive of the value of the property as against the pledgor is one thing, and whether it is conclusive of the value as against creditors is a very different thing.

[6] The trustee of the pledge must exercise good faith, taking no undue advantage of his trusteeship to his own benefit and the injury of others. In Re Mertens, 144 Fed. 818, 75 C. C. A. 548, Wallace, Circuit Judge, said:

"Doubtless the pledgee cannot avail himself of his authority, however unlimited, and sacrifice the property wantonly, or to purchase it himself at a valuation so inadequate as to suggest a fraudulent purpose."

This was quoted with approval by the Supreme Court in Hiscock v. Bank, 206 U. S. at page 38, 27 Sup. Ct. 681, at page 684 (51 L. Ed. 945). In Pauly v. Trust Co., 165 U. S. 606, at page 620, 17 Sup. Ct. 465, at page 470 (41 L. Ed. 844), Mr. Justice Harlan said:

"That the pledgee of personal property occupies towards the pledgor somewhat of a fiduciary relation, by virtue of which, he being a trustee to sell, it becomes his duty to exercise his right of sale for the benefit of the pledgor."

To the same effect is Dwight v. Singer, 27 Pa. Super. Ct. 119. In other words, the Golden Rule applies. If good faith is the test, how can it be found here in favor of the claimant, who acquired for $5,000, under the circumstances shown, pledged property of the value of $60,000, and seeks to assert his right against creditors injuriously affected thereby?

[7] But it is argued with great zeal that such defense existed when the judgment was taken on the sci. fa., and, not having been raised there, the door is forever closed; that the judgment adjudicated all questions that could be raised as to the validity or regularity of the sale, and is conclusive of the amount due the claimant, which necessarily involved the proper credit to be applied on the sale of the securities. Here, again, is the failure to distinguish between parties and creditors. The creditors have had no day in court, no opportunity to be heard. As heretofore stated, the receivers were not made parties to the sci. fa., although the estate was in their hands, both when the sci. fa. was issued and when judgment by default was obtained. The trustees could not defend, as the proceedings in bankruptcy were not begun until after the judgment was entered. The trustees cannot be charged with laches when they defend at the first opportunity given them. What are the rights of creditors in a court of equity against another creditor, whose claim is tainted with fraud, actual or constructive, when judgment has been obtained thereon in a court of law? This was once a mooted question in England, but is so no longer, either there or here. In Cochran v. Eldridge, 49 Pa. 365, Chief Justice Woodward, in an able and scholarly opinion, traced the history of the growth in English jurisprudence of the power which a court of equity has to relieve against judgments at law, when fraudulently obtained, or where some strong natural equity can be alleged against them. He shows that from the time it first engaged the attention of English chancellors,

it met with violent opposition from common-law lawyers and judges, through the reigns of many kings, finally culminating in the famous controversy conducted by Lord Coke against, and by Lord Ellsmere in favor of, the chancery jurisdiction, the very point of which was whether a court of equity could give relief for or against a judgment at common law; that from the time that question was finally decided in the affirmative, such jurisdiction has been constantly exercised in England. He further shows, by extended citations, that the courts of this country have followed the principle, whether applied by courts of chancery as an independent jurisdiction, or by courts of law exercising equity powers.

[8] That a judgment may be attacked collaterally by a creditor represented by the trustee in bankruptcy is held in McNaughton's Appeal, 101 Pa. 550. The court there had refused the application of the defendant to open the judgment, but in distribution the court held that it was well settled that a collusive judgment may be attacked collaterally by judgment or execution creditors who would otherwise be defrauded thereby, citing many cases. In Re Phelps, 3 Am. Bankr. R. 434, it was held that this doctrine applies to all sides of the court, but with particular force to bankruptcy. To the same effect are In re Continental Engine Co., 234 Fed. 58, 148 C. C. A. 74; Chandler v. Thompson, 120 Fed. 948, 57 C. C. A. 230; In re Davis, 174 Fed. 556, 98 C. C. A. 338. There a mortgage given by the bank was foreclosed and purchased by the mortgagee for costs, who later presented his claim for the full amount in a court of bankruptcy. The referee, finding that the real value of the security exceeded the debt and to allow it would be payment twice, refused the claim. This, on appeal, was affirmed by Judge McPherson, who in a clear opinion applied the well-established equitable principles above referred to.

As the record stands, it appears that the claimant here has been already much overpaid. The claimant makes his demand for further payment in a court of equity. This court will not sanction, much less lend its aid, in securing for him again that which he has already received. It follows that the order of the learned referee, allowing F. E. Markell the sum of $19,600.39, must be reversed; and it is so ordered.