In the Matter of FAREED KIAMIE, as Executor of NAJEEB KIAMIE, Deceased.

Surrogate's Court, Bronx County, February 14, 1948.

*Walter A. Lynch, Sidney A. Fine* and *Max Rosner* for executor.

*Monroe Goldwater, Harry Rodwin* and *Arthur J. Marangelo* for Colonial Trust Company, respondent.

HENDERSON, S. This is a discovery proceeding.

The executor charges that the respondent, the Colonial Trust Company (hereinafter called the "bank"), is liable for the conversion of certain shares of stock consisting of all the outstanding shares of the stock of four real estate corporations.

This stock with other collateral had been pledged with the bank by the decedent herein to secure a loan, evidenced by his note in the sum of $26,000 which became due on October 23, 1933.

The provisions of the note with respect to the sale of the pledged property were as follows: "Upon the non-payment of this note * * * the Trust Company shall have the right to sell, assign and deliver the whole or any part of the property * * * at any time or times either at the New York Stock Exchange or at any other Exchange or at any broker's board, or at public or private sale, either for cash or on credit * * *, without demand, advertisement or notice, which are hereby waived, * * *. Upon any sale as aforesaid, the Trust Company may purchase and hold the whole or any part of the property sold, free from any claim or right of redemption of the undersigned, which is hereby waived and released."

On June 21, 1933, the decedent left this country and went to Syria. Shortly prior to his departure, he visited the bank where he delivered a note dated June 21, 1933, due in three months for $26,000, in renewal of a loan maturing on the above date. At the time of this renewal, the decedent expressed the hope that he would be able to reduce the loan at maturity as a result of improved conditions with respect to the real property held by the corporations, the stocks of which were pledged with the bank. He agreed to pay $1,000 in reduction at maturity. A power of attorney on the bank's form, empowering his daughter Rose and his son Fouad to act for him was filed with the bank. In addition, the decedent signed a half-dozen blank notes to be used by the bank in connection with the handling of his loans while he was away.

It appears that it had been the bank's practice to grant the decedent small loans up to $1,000 for short periods, usually at the early part of the month, until the rents were collected from the realty owned by these corporations. After the receipt of the rents, the bank would be reimbursed.

On the day of his departure, one of the blank notes was used at his request for the purpose of putting through a loan of $1,000.

Subsequent to June 21st and shortly prior to September 21, 1933, the bank officials had numerous conversations with the two children who were the decedent's attorneys in fact, regarding the financial condition of the decedent and the members of his family. They were having difficulty in meeting the short term obligations. The bank was informed that the $1,000 payment promised by the decedent could not be made and that the interest due on the mortgages held by the Lawyers Mortgage Company on a great portion of the realty owned by the corporations, could not be paid. There were arrears in taxes. Additional loans were requested by them to meet their obligations to the mortgagee.

After considerable negotiations which involved the making of an additional small loan and the payment of interest on the large loan, the attorneys in fact and the bank acquiesced in a thirty-day renewal of the full loan of $26,000 with the understanding that the note would be reduced at maturity by $1,000. Accordingly, one of the blank notes previously executed by the decedent was used for this purpose. It was dated September 21, and matured October 23, 1933.

On this latter date, the note became in default for nonpayment. It then appears that from October 23, 1933, up to and including the day of the sale on November 15, the bank officials and various members of the Kiamie family were constantly conferring with respect to the problems created by the default.

Rose and Fouad Kiamie, who were present at these conferences, informed the bank that they could not make the payment of $1,000 as promised, and that they were endeavoring to raise funds in order to satisfy the demands of the Lawyers Mortgage Company which was threatening to bring foreclosure proceedings. There were substantial arrears in interest and taxes, and a check of one of the corporations for the sum of $2,789.20 tendered to the mortgagee for the payment of interest was returned for insufficient funds. The dominant subject of the conferences was the imminence of foreclosure and the grave need to avoid a receivership. The members of the Kiamie family were represented at these meetings by Irving L. Bruns, an attorney.

Early in November, 1933, foreclosure proceedings were commenced with respect to three of the parcels held by the corporations, and orders appointing receivers were entered.

The decedent died in Syria on Novemeber 7, 1933, and it was ascertained that he had left a will in which he named the respondent herein and his sons Fareed and Fouad as his execu-

tors. A codicil to such will, however, revoked the nomination of the bank and named Irving L. Bruns, the family attorney, to act in its place.

The instruments were not admitted to probate until July 12, 1934.

At the conferences in November, 1933, the officials of the bank suggested certain steps to be taken in an endeavor to secure the co-operation of the Lawyers Mortgage Company in order to avoid the foreclosure. As a result of the bank's efforts, the mortgagee consented to stop the foreclosure proceedings if it received an assignment of rents. The Kiamie family, however, refused to make the assignment. Thereafter, the bank made arrangements for the sale of the collateral.

On November 13, 1933, written notices were sent by mail, special delivery, to Fouad, Fareed and Rose Kiamie, three of decedent's children, to the widow and to Irving L. Bruns, their attorney, advising them that by reason of the default in the payment of the note on October 23, 1933, the collateral held by the bank would be sold at public auction at the Exchange Salesroom, 18 Vesey Street, New York City, at 12:30 o'clock P.M. on November 15, 1933. Public notice of the sale was printed in the Wall Street Journal and in the New York Herald-Tribune on November 14, and November 15, 1933. The collateral was also listed in a printed catalogue of the sales of various stocks and bonds to be sold by the auctioneer on that day.

On the morning of November 15th, Rose, Fouad and Fareed Kiamie, with their attorney, Mr. Bruns, appeared at the bank. They requested a postponement of the sale so that they might make further efforts to solve their financial difficulties. However, as any proposal suggested by them involved the lending of more money, the bank refused to make the postponement and the sale took place as scheduled.

The bank bid in the stocks of the real estate corporations for the sum of $5,000, while the other collateral with which this proceeding is not concerned, was purchased by an outsider. None of the members of the Kiamie family attended the sale. The bank, having purchased the certificates, caused them to be transferred to the name of a nominee.

The gross amount received on the sale left a substantial deficit.

The executor contends that the public sale was invalid because the bank failed to follow the formalities as to notice and advertisement prescribed by sections 200, 201 and 202 of the Lien Law for the satisfaction of a lien upon personal property. In

support of this contention, he asserts that not only did the provisions of the note waiving notice become ineffective by reason of the death of the decedent, but that the bank by its conduct, waived the right to proceed under such provisions. He further asserts that the bank, having elected to hold a public sale, was legally compelled to comply with the requirements as to public sale set forth in the Lien Law, despite the waiver provisions in the note. He also charges the bank with bad faith in making the purchase of the collateral.

It is fundamental that the pledgee's lien and right to sell the pledged property survive the death of the pledgor. This power to sell has been defined as an authority coupled with an interest, and as such is irrevocable (*Matter of Tabbagh*, 167 Misc. 156).

This principle of law is likewise applicable to the right of the pledgee to sell without notice 'where the parties have so stipulated. The legal reason behind the general rule with respect to the survival of the power of sale upon the death of the pledgor applies with equal force to any agreed method of procedure to be followed in its exercise. The power and the manner of its use must be treated alike. One is no more subject to revocation than the other.

The assertion that the bank waived its right to proceed under the waiver provisions of the note is based upon the case of *Toplitz* v. *Bauer* (161 N. Y. 325), which holds that a pledgee may give by conduct, such assurance to the debtor that further time and indulgence will be granted as will amount to a waiver of the right to sell without notice.

In support of the alleged waiver, the executor has shown that the decedent had transactions with the bank since 1929 and that a very friendly relationship existed between the decedent and the employee of the bank who handled the decedent's business. The executor depends mainly upon statements made by the representatives of the bank during the conferences early in November, 1933, with respect to the impending foreclosure proceedings. These statements were to the effect that a receivership would be disastrous to everyone; that the bank desired to take every possible step to avoid a foreclosure and if possible " to hold the *status quo* " until the decedent returned.

The witnesses for the bank, however, have clearly shown that at all times the chief concern of its officials was the protection of the bank. The attitude of these officials was at all times known to the members of the Kiamie family and the attorney who represented them. They were continually informed that, while it was the bank's desire to co-operate, the bank must

protect itself. There .was nothing in the conduct of these officials which would lead the members of the Kiamie family to believe that the bank would not resort to the collateral and proceed under the waiver provisions of the note. No extension of the note was made. There were no verbal promises or assurances that indulgence would be given. The evidence is clear that the actions of the officials were at all times consistent with the duty which they owed to the bank and its depositors.

The waiver provisions in the note having been unaffected by the occurrences relied upon by the executor, the question remains as to whether or not the public sale violated the Lien Law. It has been held that the provisions of this statute may be waived by the parties (*Letzter* v. *Nager,* 186 N. Y. S. 578; *Jacobs* v. *National Bank of Far Rockaway,* 13 N. Y. S. 2d 60). In the latter case, it is interesting to note that at the time of the sale the debtor had died. Nevertheless, it was held that notice was not necessary to the executor of decedent's will where such notice had been waived and the will was not filed for probate until several months later.

The petitioner insists that the waiver provisions apply only to a private sale and do not affect a public sale which must be conducted according to section 202 of the Lien Law.

The pledgee's power to sell is an incident to the pledge and is a part of the security for the debt (*Stearns* v. *Marsh,* 4 Denio 227). While a pledge and a lien are alike insofar as they are intended as security for an obligation, and the lienholder like the pledgee has possession, the lienholder has no authority to sell the property except as provided by statute (Dobie on Bailments and Carriers, § 70). In the State of New York, this right is granted to the lienholder by sections 200 to 210 inclusive of the Lien Law. This statute extends to all lienors, the right of sale which always existed at common law in a pledge of personal property (*Dininny* v. *Reavis,* 100 Misc. 316, affd. 178 App. Div. 922). The " lienor " mentioned in the sections of the Lien Law is a person having a lien by virtue of its provisions (Lien Law, § 2). Nothing contained in that statute affects the rights created by a pledge. It is therefore clearly not applicable to the case at bar. The case of *Keleher* v. *O. Edwin Barnes, Inc.* (236 App. Div. 760), relied upon by the petitioner, is no authority for his contention. While the court cited section 201 of the Lien Law upon the question of the necessity for notice of sale by a pledgee, it also cited *Smith* v. *Craig* (211 N. Y. 456, 459) and *Content* v. *Banner* (184 N. Y. 121), which hold that a pledgee must sell upon reasonable notice in the absence of agreement

as to notice. These cases make no mention of any statutory provision regulating the conduct of a pledgee.

The law is well settled that the parties to a pledge may dispense with the giving of any notice relating to the sale of collateral (*Smith* v. *Craig, supra*).

The purpose of the notice is to give the pledgor an opportunity to redeem and to be present at the sale to see that it is fairly conducted and that the property is disposed of to the best advantage (*Small* v. *Housman*, 208 N. Y. 115).

The members of the Kiamie family served with notice were given these opportunities when the bank chose to notify them although not legally obligated to do so. After receipt of the notice, they merely contented themselves with requests for a postponement instead of appearing at the auction rooms. Prior to the sale and subsequent thereto, they had opportunities to purchase the bank's position, but were unable to do so because of their lack of financial means and their inability to obtain funds from an outside source. It was always made clear to them that the bank did not desire to be possessed of the real estate with the hazards incidental to such ownership, and would welcome a satisfactory solution.

Subsequent to the sale, efforts were made by persons retained by members of the Kiamie family, to obtain purchasers and to interest other people in a proposal whereby the properties could be returned by the bank. These efforts continued until March, 1934, when it was obvious to the bank that no proposal looking to the restoration of the properties to the Kiamie family and the payment of the money which the bank had involved in the transaction, could be made.

The proof also indicates that the place of the public sale of the stock was one at which securities of that nature were customarily sold. If it was an improper place for a public sale, the petitioner had the burden of showing it (Colebrooke on Collateral Securities, § 331).

The petitioner accuses the bank of bad faith by reason of the short period of the public notice. Again it must be pointed out that the decedent waived such advertisement, and the bank again performed an act which it was not legally obligated to do. However, if advertisement was required, the public notice given in this case was legally sufficient (*Turner* v. *Metropolitan Trust Co.*, 207 F. 495; *Bush* v. *Adams*, 165 F. 802; *Matter of Mertens*, 144 F. 818). In any event, the petitioner had the burden of proving that others were prepared to purchase and might have done so but for want of information, or that they were prepared

to redeem the pledge (*Hiscock* v. *Varick Bank of New York,* 206 U. S. 28). The evidence conclusively shows that despite every effort, the members of the Kiamie family were unable to find any person interested in purchasing these assets.

The difficulties of the Kiamie family in this respect can be readily understood, and the court must take judicial notice of the period of depression which existed at the time of these transactions and the lack of a market for real estate (*Matter of New York Title & Mortgage Co.,* 21 N. Y. S. 2d 575, 589). During this time ordinary conditions did not exist in such market. They were " extraordinary and unprecedented " (*Heiman* v. *Bishop,* 272 N. Y. 83, 87). The Legislature of the State of New York declared an emergency and enacted legislation to meet the conditions which had arisen in the real estate market due to financial stringency and depression (L. 1933, chs. 793, 794).

The executor makes the further assertion that there has been such an inadequacy of price received upon the sale as to raise a presumption of fraud.

If the price was unfair, the burden was on the executor to prove it (*Hiscock* v. *Varick Bank of New York,* 206 U. S. 28, *supra*). For his proof, he relies upon a typewritten memorandum on a conference with a Jacob Slade who was brought to the bank by the Kiamie family to help in solving their difficulties, and a notation in pencil upon the bank's loan card indicating a value of $93,000 for the property.

This proof is clearly insufficient to sustain this burden. The courts have set forth the elements which must be considered in ascertaining the value of real estate during the period of the depression (*Heiman* v. *Bishop, supra*), and these elements are lacking in the proof submitted. Moreover, it has been held that a sale may not be set aside for inadequacy of price alone; there must be coupled with it other evidence of fraud (*Montgomery Bank & Trust Co.* v. *Jones,* 182 App. Div. 252, affd. 230 N. Y. 580; *Palmour* v. *Roper,* 119 Ga. 10; *Winchester Rock & Brick Co.* v. *Murdough,* 233 Mass. 50).

The petitioner has completely failed to show the invalidity of the sale or the existence of bad faith.

The petition is therefore dismissed upon the merits.

Settle decree.